Mr. Justice McKINLEY
deliyered the .opinion pf the court.
•This case comes-before this court upon a-writ of error to the Supreme. Com# of Alabama.
An action of ejectment was brought by the plaintiffs against the défendants, hi the Circuit Court of Mobile county, in said' state; ■and upon the trial, to .support their action, “ the plaintiffs, read in evidence ¿.patent from the United States for the premises in question,. and án act-of Congress passed the 6th day of July, 1836, confirming to them the premises in the patent mentioned, together with afi act of Congress passed the 20th of May, 1824. The premises in question ..were admitid by the defendants to be compre- - hended withixr the patent; and-there was likewise an admission by bóth-parties that the-land lay befweeq. Church street and North Boundary street,, in the city of Mobile;; and there the plaintiffs rested their case.”-
*220 ■. “ The defendants, to maintain the .issue on their part, introduced a witness to prove that the'premises in question, between the years 1819 and i823,. were covered by. water of the Mobile river at com* mon high tide' ;”' to which evidence the plaintiffs by their counsel objected; but the court overruled the-objection; and permitted the evidence to go to the jury. “ It was. also in proof, on the part of the defendant, that at the date of the Spanish grant to Panton', ■ Leslie & Co., under which they claim, the waters of the Mobile bay, at high tide, flowed over what is now Water street, and over about- . oné-third of the .lot west of Water street, conveyed by the Spanish '.grant to Panton, Leslie.&. Co.-; and. that the waters continued to overflow-Water street, and the premises sued for,.during alL.the •time, up to 1822 or 1823; to all which admisáons of evidence, on part of the defendants, the- plaintiffs excépted.” “-The court-charged the jury, that if they believed the -premises sued- for were below usual, high water-mark, at the time Alabama was admitted into-the union, then .the act of Congress, and the- patent hi pursuance thereof, could give the.plaintiffs no title, whether, the waters had receded by the labour.- of man only, or by alluvion; to which the plaintiffs.excepted.; Whereupon a verdict and judgment were . rendered in. favour of the defendants, and which-judgment was afterwards affirmed ,by the. Supreme Court of the state.”
• This. question, has been heretofore raised, before this court, in • cases-from, the same state, but they went off upon other points. ' As now presented;-it is the only question necessary to the decision of the -case, before, us, and must, therefore, be-decided. And We ' now. enter into its examination with a just sense of its great importance to all the-states of the union, and particularly to the new ■ones. Although this* is the first-time we have, been called upon to r draw the line that separates the sovereignty and. jurisdiction of the government of the-union, and-the state governments, over the- subject in controversy, many of the principles which enter into and-form'the elements of the question have been settled by previous, well considered,-.decisions, of this-.court, to which we shall-have occasion to refer in the course of this
The. counsel- for- the plaintiffs insisted, in argument, that the' United States derived tide to that part of Alabama, in which the land, in controversy lies, from the King of' Spain; and that they succeeded to-all hisrights, powers, and jurisdiction, over the- territory céded, and therefore hold the land and1 soil, under navigable .waters,, according-to the laws-and - usages bf- Spain; and by those-•laws-and.usages the-.fights of .a subject to-land derived-from the-' crown could hot extend' beyond high -water-mark; oh navigable waters, without' an express grant;.' .and that all alluvion belonged to the crown, .and might be granted by this king;, together with all between high, water and the channel of such navigable waters;' and; by the' compact- between the United States and Alabama, on *221 her admission into the union, it was agreed, that the people of Alabama for ever disclaimed all right or title to the waste or unappropriated lands lying within, the state, and that the sáme slfeuld remain at the sole -disposal of the United States,; and that all the navigable waters within .fee' state should for ever remain public' highways, and free to the citizens of that state and the United States^ .without any tax, duty, or impost, or toll therefor, imposed by that state. That by these articles of the compact, the land under the navigable waters, mid the public domain above, high water, were alike reserved to the United States, and alike subject to be sold by them; and to give any other construction fe these compacts, would be to yield up to Alabama, and the other new states, all the public •lands within their limits.
We think a proper, examination of this subject will show, that the United States never held any municipal sovereignty, jurisdiction, or right of’- soil in and to the territory, of which Alabama or ■any of -the new states .were formed; except, for temporary, purposes, and to execute the trusts created by the acts of the Virginia- and Georgia- legislatures, and the deeds of cession executed by them to. the United States, and the trust created by the treaty with the French republic, of the 30th. of April, 1803, . ceding Louisiana.
All that part of Alabama which lies between the thirty-first and thirty-fifth degree of north, latitude, was ceded by the state of Georgia, to the United States, by deed bearing -date the 24th day of April, 1802, which is substantially; in-all its principles and' stipulations, like, the deed of cession executed by' Virginia to the United States; on the 1st day of March, 1784, by which she-ceded to fee-United States the territory'north-west of the river-Ohio. Roth oft these , deeds of-cession stipulated, that all the'land’s within the territory ceded, and- not reserved or. appropriated- to other purposes; should be considered as. a common fend for the use and benefit .of all the United States, to. be faithfully and bona fide disposed of for that purpose, and for no .other use or purpose whatever: ' And the statute passed by Virginia authorizing hér delegátes to execute this deed, and which is recited in- it, authorizes them, in behalf of the state, by a proper deed.tó Convey to the United States, for the benefit of said states, all the- right; 'title ■, and claim, as well of .soil as jurisdiction, “upon'condition' feat fee. territory so ceded' shall be .laid put .and formed into states, containing a-suitable extent of territory, not.less than 100, nor miore than 150 miles, square, ór as near thereto as circumstances will-admit: and that, fee states so formed shall be republican states and- admitted members of fee federal union,- having fee same- rights of sovereignty-, freedom,, únd- .independence, aS the other states.’’ And fee delegates, conclude the deed thus: “Now know ye,feat we, the said- Thomas Jefferson,. Samuel Hardy, Arthur’Lee, and James. Mónroéy by virtue of the *222 power and authority committed to us-by the act of the said general assetnbly of Virginia before recited, and in the name and for and on behalf of the said commonwealth^ do by these presents convey, transfer, assign, and make dver unto the United States' in. Congress assembled, for the benefit of said states, Virginia inclusive, all -right, title, and claim,, as well of soil as-of jurisdiction, which the said •commonwealth-hath! to the territory or tract of -country within the limits-of the Virginia charter, situate, lying, and being to the northwest of the river- Ohio, to and for the. uses and purposes, and on the conditions of the said recited act,” '
And in the deed of .cession by Georgia it is' expressly stipulated, “That the territory-thus ceded shall form,a state and be admitted as such into the union ás soon as it shall-contain sixty thousand free inhabitants, or-at an earlier period if- Congress shall think it'expedient, on the same-conditions and restrictions, with the same privileges, and in the same manner,, as is provided in the ordinance of Congress of the 13th day of July, 1787, for the .government of the . north-western territory of the United States, which ordinance shall in all its parts extend to the territory contained in the present act of cession, that article only excepted which forbids slavery.’’ The manner ,in-which the new states , were to be admitted into the union, according to the ordinance of .1787, .as expressed therein, is as follows: “ And’whenever any of thé.said states shall have-sixty thousand free inhabitants therein, such state shall be admitted, by its delegates into the Congress of the United States, on an equal footing'with the original states in all respects' whatever.” Thus it appears that the stipulations; trusts, and conditions, are substantially the samé, in- both’of these deeds of cession, ; and the acts of Congress, and of the state legislatures in relation theretoj-are founded, in the same reasons of policy and interest, with this exception, however — the cession made"by Virginia was before'the adoption of. the Constitution of the United States, and that of Georgia, afterwards. Taking the' legislative acts of"the United States, and the states of Virginia and Georgia, and. their deeds of cession to the United . States, and giving to each, separately, and to all .jointly, a fair interpretation, we must come to the conclusion that it was. the intention of the .parties to invest the United States with the eminent domain of the Country ceded, both national -and municipal, for the purposes-of temporary government, and to hold it in -trust for the performance of the stipulations and condition's expressed in the deeds of cession and, the legislative acts connected with them. To a correct understanding-of the rights, powers; and duties of the par.ties-tó, these' contracts, it is necessary to enter into a more minute examination of the- rights of eminent -domain, and the right to the public lands. When the Unite'd States accepted the cession of the territory, they took -upon themselves the trust to hold the municipal eminent domain for the new states, and to invest them with it, to *223 the same extent, in all respects, that it was held by the states ceding the territories.
The right which belongs to the society, or to the sovereign, of disposing, in case of necessity, and for. the public safety, of all the wealth contained in the state, is called the eminent domain. It is evident that this right is, in certain cases, necessary to him who governs, and is, consequently, a part of the empire, .or sovereign power. Vat. Law.of Nations, section 244.. This definition shows, that the eminent domain, although a sovereign power, does not include all sovereign power, and this explains the sense in which it is used in this opinion. The compact made between the United States and the státe of Georgia,.was sanctioned by the Constitution of the United States; by the 3d section of the 4th article of which it is declared, that “New states, may be admitted by the Congress into this union; but no new state shall be formed or erected within the jurisdiction of ary other state, nor. any state be formed by the junction of two or more states or parts of states, without the consent of the legislatures of the states concerned, as wéll as of Congress.”
When Alabama was admitted into the union, bn an equal footing with the original states, she succeeded to all the rights of sovereignty, jurisdiction, and eminent domain which Georgia possessed at the date of the cession, except so far as this right was diminished by the public lands remaining in the possession and under the control of the United States, for the temporary purposes provided for in the deed of cession and.the legislative acts connected with it-. Nothing remained to the United States, according to the terms of the agreement, but the public lands. And, if an express stipulation had been inserted in the agreement, granting the municipal right of sovereignty and eminent domain to the United States, such stipula-. tion would have been void and inoperative; because the United States have no constitutional capacity to exercise municipal jurisdiction, sovereignty, or eminent domain, within the limits of a state or elsewhere, ex;cept in the cases in which it is expressly granted.
• By the 16th clause of the 8th section of the 1st article of the Constitution; power is given.to Congress “to exercise exclusive legislation-in all cases- whatsoever, over such district (not exceeding ten miles square) as may by cession of particular states, and the acceptance of Congress, become the seat of government of the United States, and to exercise like authority over.all’places purchased, by the consent of the legislature of the state in which the same may be, for the erection of forts, magazines, arsenals, dock-yards,, and other needful buildings.” Within the District of Columbia, and the other places purchased ánd used for the purposes above mentioned, the national and municipal powers of government, of. every description, are united in the government of the union. And these are the only cases, within the United States, in which all the powers .of, government are united in a single government, except in the cases already *224 mentioned of the temporary territorial governments, and there a local government exists. The right of Alabama and every other new state to exercise all the powers of government, which belong to and may be exercised' by the original states of the union, must "be admitted, and remain unquestioned, except so far as they are, temporarily, deprived of contrpl over the public lands.
’We wül now inquire into the nature and extent of the right of the United States to .these lands, and-whether that right can in any manner affect or control the decision of the cáse before us. This right originated in voluntary surrenders, made by -seyeral of the old states, of their waste and unappropriated lands, to'the United States, under ■a resolution of the old Congress, of the 6th of September, 1780, re- . commending such surrender and cession, to aid in paying the public debt, incurred by the-war of the Revolution. The object of all the parties, to these contracts of cession, was to convert the land into, money for the payment of the debt, and to erect new states over the' territory thus ceded; and as soon as these purposes could be.accomplished,the power of the United States over these lands, as property, was to cease.
Whenever the United States.shall have fully executed these trusts, 1he municipal sovereignty of the new states will be complete, throughout their respective borders, and they, and the original states, will be upon an equal- footing, in all respects whatever. We, therefore, think the United States hold the public lands within the new states by force of the deeds of cession, and the statutes connected with them, and not by any municipal sovereignty which it may be supposed they possess, or have reserved by compact with the new states, for that- particular purpose. The provision of the Constitution above ■ referred to shows that no such power can be exercised by the United States within a state. Such a power is not only repugnant to the Constitution, but it is inconsistent with the spirit and intention of' the deeds of cession. The argument so much relied on by the counsel for the plaintiffs, that the agreement.of the people inhabiting the new states, “that they for ever-disclaim all right and title to the waste or unappropriated lands lying within.'the said territory; and that the same shall be and remain at thewsole and entire.disposition of the United States,” cannot operate as a contract between-the parties, but is binding.as a law. Full power is given.to Congress “to make all' needful-rules' and regulations respecting the territory or other property of the United States.” This authorized the passage of all laws necessary, to. secure-the rights of the United States to the' public lands, and to provide for their sale, and to protect them from taxation.
And alLconstitutional laws are binding on the-people, in the new states and the old ones, whether they consent to be bound by them •or not. /Every constitutional act of Congress is passed by the will' of the people of the United States,; éxpressed through-their repr.e- *225 sentatives, on the subject-matter of the enactment; and when so passed it becomes the supreme law of the land’, and operates by its own force on the subject-matter, ip whatever state or territory it may. happen to be. The proposition, therefore, that such a law cannot operate upon the subject-matter of its enactment, without the express consent of the .people of the new state where it may happen to be, contains its own refutation, and requires no farther examination. The propositions submitted to the people of the Alabama territory, . for their acceptance or rejection, by the act of CongresSvauthorizing them to form a constitution and state government for themselves, so far as they related to the public lands'within that territory, amounted to nothing-more nor less than rules and regulations respecting .the ., sales and disposition of. the public lands. The supposed compact relied on by the counsel for the plaintiffs, conferred no authority, therefore, on Congress to pass the act granting to the plaintiffs the land in controversy.
And this brings us to the. examination of the question, whether Alabama-is entitled to the shores of the navigable waters, and the soils under them, within her limits. The principal argument relied on against this right, is, that the United States acquired the land in controversy from the King of Spain. Although there was no direct reference to any particular treaty, we presume the treaty of the 22d of February, 1819, signed at Washington, was the one relied on, and shall so consider the argument. It was insisted that the United States had, under the treaty, succeeded to all the rights .and powers' of the King_of Spain; and as by .the laws and usages of Spain, the king had the right to grant to a subject the soil under navigable, waters, that, therefore, the United States had the right to grant the land in controversy, and thereby the plaintiffs-acquired a complete title.
If it were true that thfe United States acquired the whole of Alabama from Spain, no such consequences would result as those contended for. If cannot be admitted that the King of Spain could, by ' treaty or otherwise, impart to the United States any of his royal prerogatives; .and.much less can it be admitted that they have capacity to receive or power to exercise them. Every nation acquiring territory, by treaty or .otherwise, must hold it subject to the constitution and laws of its own government, an dm ó t according to thoseof the government, ceding it;. Vat. Law of Nations, b. 1, c. 19, s. 210, 244,245, and b. 2, c. 7, s. 80.
The United States have hfever claimed any part of the territory included in the states of Mississippi or Alabama, under any treaty with Spain, although she claimed at different periods a considerable portion of the territory in both of those states. By the treaty between the United States and Spain, signed at San Lorenzo el, Real, ■ bn the 27th of October, 1795, “ The high contracting parties declare and agree, that the line between the United States and East, and West rlorida,. shall be designated by a line, beginning on the river *226 Mississippi, at the northernmost part of the thirty-first degree of north latitude, which from thence shall be drawn due east to the middle of the Chatahouchee river,” &c. This treaty declares and agrees, that the line which was described in'the treaty of peace between Great Britain and the United States, as their southern boundary, shall be the line which divides their territory'from East and West Florida.’ The article does not import to be a cession of territory, but the adjustment of a controversy between the two nations. It is understood as an admission that the right was originally in the United States. .,
Had Spain considered herself as ceding territory, she could not ■have neglected to stipulate for the property of the inhabitants, a stipulation w'hich every sentiment of justice and of national honour would have demanded, and which the United States would not have refused. But, instead of requiring an article- to this effect,* she expressly stipulated to withdraw the settlements then within what the treaty admits to be the territory of the United States, and for perithission to the settlers to take their property with them. “ We think this an unequivocal acknowledgment that the occupation of the territory by Spain was wrongful, and we think the opinion thus clearly indicated was supported by the state of facts. It follows,_ that Spanish grants made after the treaty of peace can have no intrinsic validity.” Henderson v. Poindexter, 12 Wheat. 535.
Previous to the cession made by Georgia, the United States, by the act- of Congress of the 7th of April, 1798, had established the Mississippi territory including the territory west of the Chatahouchee river, to the Mississippi river, above the 31 sl^ degree of north latitude, and below the Yazous river, subject to thexclaim of Georgia to any portion of the territory. And the territory thus erected was subjected to the ordinance of the 13th of July, 1787, for its government, that part of. it excepted which prohibited slavery: 1 Story’s Laws, 494. And by the act of the 1st of March, 1817, having first •obtained consent of Georgia to make two states instead of one within the ceded territory, Congress authorized the inhabitants of the western part of the Mississippi territory to form for themselves a constitution and state government, “to consist of all the territory included within the following boundaries, to wit: Beginning on the river Mississippi at the point where, the southern boundary line, of the state of Tennessee strikes the samé; thence, east along the said boundary line to the Tennessee river; thence up the same to the mouth' of Bear creek; thence by a direct line, to the north-west qomerof Washington county; thence due south to the-Gulf of. Mexico; thence westwardly, including all.the islands within six léagues- of the shore,- to. the junction of Pearl river with Lake Borgne; thence up said river to the thirty-first degree of north latitude ; thence west along said degree of latitude to the Mississippi river; thence up the same to the beginning.” 3 Story’s Laws, 1620. *227 Aiid on the 3d of March, 1817, Congress passed an act declaring, "That all that part of the Mississippi territory which lies within- the following boundaries, to wit: Beginning at the point where the line of the thirty~first degree of north latitude intersects the Perdidt river; thence east to the western boundary line of the state of Georgia thence along said line to the southern boundary line of the state of Tennessee; thence west, along said boundary line, to the Tennessee river; thence up the sam~e to the mouth of Bear creek; thence by a direct line to the north-west corner of Wash- ington county; thence due south to the Gulf of Mexico; thence eastwardly, including all the, islands within six leagues of~the shore to the Perdido' river; thence up the same to the beginning; shall, for the purposes `of ~emporary government, constitute a separate ter- ritory. and be called Alabamn.
Alabamn. And by the 2d section of the same act it is enacted, "That all offices which exist, ai~d all laws which may be in force when this act shall go into effect, shall continue to exist and be in force until otherwise provided by law." 3 Story's Laws, 1634, 1635. And by the 2d article of the compact contained in the ordinance of 1787, which was then in force ~n the Mississippi territory, among other things, it was provided, that "The inhabitants of the said territory shall always be entitled to the benefits of the writ of habeas corpus, and of the trial by jury, and of judicial proceedings according to the course of the common law. And by tl~e. proviso to the 5th sec- ~ion of the act of the 2d of March, 1819, authorizing the people of the Alabama territory to form a constitution and state government, it is enacted, "That the constitution, when formed, shall be republi- can, and not repugnant to the ordinance of the 13th of July, 1787, between the states and the people of the territory north-west of ;the Ohio river, so far as the same has been extended to the said tetri- tory [of Alabama] by the articles of ~greemeat between the United States and the state of Georgia; By these successive acts on part of the United. States, the common law . has been extended to all the territory within the limits of the state of Alabama, and therefore excluded all other law, Spanish or
It was. It was after tbe date o(the treaty of the 22d of February, 1819 bet-ween the United States and Spain, but before its ratification, th people of the Alabailla territory were authorized to form a tution; and the state was admitted into the. union, according to below established when the country was erected into a territo rial government. But the United States have never admitted thai they derived title from the Spanish government to any portion of the territory included within the limits of Alabama. Whatevei claim Spain maThave asserted to the territory above the thirt~firsI degree of north latitude plior to the treaty of the 27th of October 1795 was abandoned by that freaty as has been already- shown. We will now inquire whether she had any right to -territory below *228 the thirty-first degree of north latitude, after the treaty between France and the United States, signed at Paris on the 30th of April, 1803, by which Louisiana was ceded to the United States. The legislative and executive departments of the government have constantly asserted the'right of the-United States to this portion of the territory under 'the .1st article of this treaty; and sa series of measures intended to maintain the right have been, adopted. Mobile was taken possession of, and erected into a collection district, by act of the 24th of February, T804, chap. 13, (2 Story’s Laws, 914.) In the year 1810, the President issued his proclamation, directing the governor of the'Orleans territory tq take possession of the .country, as far as the Perdido,.and hold it for the United States. In April, 1812, Congress passed an act'to enlarge the limits of Louisiana. .This act includes -part; of the country claimed by Spain, as West Florida. And in February, 1813, the President wasauthoriaed to occupy and hold all,that tract of .country called West Flofidaj which lies west of the river Perdido, not then in the possession-of. the United States. And these meásures having been followed' by the erection of Mississippi-territory into a state, and the erection of Alabama into a territory, and afterwards into a state, in the year 1819, and extending them both over this territory: could it be doubted that these measures. were • intended as an assertion of the' title of the United States to this country?'
In the case of Foster and Elam v. Neilson, 2 Peters, 253, the right of the United States to . this country underwént a very able and thorough investigation. Arid Chief Justice Marshall-, in delivering' the opinion of the court, said; “ After these acts of sovereign power over the territory in dispute, asserting the American construction ' of the treaty, by which the government elaims it, to maintain the opposite construction in its own courts would certainly.be an anomaly in the history and practice of nations. If those departments, which are intrusted with the foreign intercourse of-the-nation, which assert and maintain its interests against foreign powers, have unequivocally asserted its rights of dominion over a country of which it is in possession,, and which it claims under a treaty; if the legislature has acted on the construction thus asserted, it is riot in its own courts that this constriction is to be denied.”. The chief justice then discusses.the validity of the grant made by the Spanish government, after the ratification of the treaty between-the United States and France, and it is finally rejected on the ground-that the country , belonged to the United States, and riot to Spain, when the grant • was made. The same doctrine was maintained by this court in the case of Garcia v. Lee, 12 Peters, 511. These cases establish, b‘eyqnd controversy, the right of the United States to the whole of this territory, under the treaty with. France.
- Alabama is, therefore, entitled to the sovereignty and jurisdiction. Over all the territory within her limits, subject to the common law, *229 to the same extent that Georgia possessed it before she ceded it to the United States. To maintain any other doctrine, is to deny that Alabama has been admitted into the union on an equal footing, with the original states, the constitution, laws', and compact, to the contrary notwithstanding. But her rights of sovereignty and jurisdiction ai'e not governed by the common law of England as it pre-. vailed in the colonies before the Revolution, but as modified by our own institutions. In the case of Martin and others v. Waddell, 16 Peters, 410, the present chief justice, .in delivering the opinion of‘the court, said: “When the Revolution took place, the people' of each state became themselves sovereign; and imthat character .hold the absolute right to all their navigable waters, and the soils, under them for their own compaon use, subject only to the rights since surrendered by the. Constitution.”,, Then to Alabama belong the navigable waters, and soils under thém, in controversy iji this case, subject to'the rights surrendered by the Constitution to the United States; and no compact that might be made between her • and the United States could diminish or enlarge these rights.
The declaration, therefore,- contained in the compact éntered into between them when Alabama was admitted into the union, “ that all navigable waters within the said state shall for ever remain public highways, free to the.citizens of said state, and of the United States, without any tax, duty, impost, or toll therefor, imposed by the said state,” would be void if inconsistent with the Constitution of the United States.. But is this provision repugnant to the Constitution ? By the 8th section of the 1st article of -the Constitution," power is granted to Congress “ to regulate commerce with foreign nations, and among the several states.” If, in the exercise of this power, Congress can impose the same restrictions upon the original states,, in relation to their navigable waters, as are imposed, by this article of the compact, on the state ofj, Alabama, then this article is a mere regulation of commerce among the several states, according to the Constitution, and, therefore, as binding on the other states as Alabama.
In the case of Gibbons v. Ogden, 9 Wheat. 196, after examining the preliminary questions respecting the regulation of commerce with foreign nations, and among the states, as connected with the subject-matter there in controversy, Chief Justice Marshall said: “ We are now arrived at the inquiry: What is this power ?
“It is the power to regulate, that is, to prescribe the- rule by-which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in "the Constitution. These are expressed in plain terms, and- do not affect the questions which arise in this case. If, as has been always understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over *230 commerce with foreign nations, and among the several states, is vested'in Congress as absolutely as it would be in a single government having in its constitution the same restrictions on the exercise of the power as are found in the Constitution of the United State.s.” As the provision of what is called the Gompact between the United States and the state of Alabama does not, by the above reasoning, exceed the power thereby conceded to Congress over the original states on the same subject, no power or right was, by the compact, intended to be reserved by the United States, nor to be granted to them by Alabama.
This supposed compact is, therefore, nothing more than a regulation of commerce, to that extent, among the several states, and can have no controlling influence in the decision of the case before us. This right of- eminent domain over the shores and the soils • under the navigable waters, for all municipal purposes, belongs ex- • clusively to the states within their respective territorial jurisdictions,' andjfhey, and they only, have the constitutional power to exercise it. To give to the United States the right to transfer to a -citizen the title to the shores and the soils under the navigable waters, would be placing in théir hands a weapon which might be wielded greatly to the injury of state sovereignty, and deprive the states of the power .'to exercise a numerous and important class of police po.wers. But in the hands of the stales this power can never be used so as to affect the exercise of any national right of eminent domain or jurisdiction with which the United States have been invested by the Constitution. For, although the territorial limits of Alabama have extended all her sovereign power into the sea, it is there, as on the ' shore, but municipal power, subject to the Constitution of the United States, “ and the laws which -shall be made in pursuance thereof.”
By the preceding course of reasoning we have arrived at these general conclusions: First, The shores of navigable waters, and the soils’ under them, Were not granted by the Constitution to the United States, but were reserved to the states- respectively. Secondly, The new states have the same rights, sovereignty, and jurisdiction .over this1 subject as the original states. Thirdly, The right of the United States- to the public lands, and the power of Congress to make all needful rules-and-regulations for the. sale, and disposition thereof, conferred no power to grant to the plaintiffs the land in controversy in this case. The judgment of the.Supreme Court of the state of Alabama is, therefore, affirmed.