[Sac. No. 2081. In Bank.—January 20, 1914.]

# DESERET WATER, OIL AND IRRIGATION COMPANY (a Corporation), Respondent, v. THE STATE OF CALIFORNIA, Appellant.

EMINENT DOMAIN—FOREIGN CORPORATION—RIGHT TO CONDEMN PROPERTY.—A foreign corporation, which has complied with the laws of this state governing its right to do business herein, may exercise the power of eminent domain.

ID.—PUBLIC SCHOOL LAND—EFFECT OF FOREST RESERVATION.—Where title to a section of land has completely vested in the state by virtue of the federal school land grant, the subsequent creation of a national forest reservation, which within its exterior boundaries includes the school land, does not affect or impair the title of the state thereto.

ID.—CREATION OF FOREST RESERVE—EFFECT ON TITLE TO LANDS.—The creation of a national forest reserve is, as to such lands as are under control of the federal government, a dedication and an appropriation of these lands to a public use. But lands which are surrounded by such reserve and which are held in private ownership, either by the state or by other locators, pre-emptors or purchasers from the general government, or from the state, are not likewise appropriated to a public use.

ID.—PROPERTY SUBJECT TO CONDEMNATION—SCHOOL LAND SURROUNDED BY FOREST RESERVE.—School land granted to the state by the federal government and surrounded by a national forest reserve is not appropriated to a public use and may therefore be condemned in eminent domain proceedings instituted by a public service corporation.

ID.—OFFER OF STATE TO EXCHANGE SCHOOL LAND—WANT OF ACCEPTANCES BY FEDERAL GOVERNMENT.—The taking of appropriate steps by the state in the various federal land-offices to exchange such school land for other equivalent public land, pursuant to the provisions of sections 3398 to 3409 of the Political Code, which provide that such lands may be used as "bases for indemnity selections provided by law," does not constitute a dedication of such to "public use" so that it cannot be condemned under the power of eminent domain.

ID.—LOSS OF SCHOOL LAND BY STATE—INDEMNIFICATION BY FEDERAL GOVERNMENT—EXCHANGE OF LANDS.—Section 2275 of the United States Revised Statutes of 1891, the only federal law on the subject, which declares that when any school sections conveyed to a state are lost to the state, either by superior claims of homestead

or pre-emption settlers, or because they are mineral lands, or are included within any Indian, military, or other reservation, or because they are otherwise disposed of by the United States, "other lands of equal acreage are hereby appropriated and granted and may be selected in lieu of such as may be thus" lost, does not contemplate an exchange of lands between the state and the United States, but the making good to the state of a loss which it may sustain through failure to get land which the United States attempted to grant it.

Id.—Indemnity Selections—School Sections as Bases—Status of Federal Law.—While the state has by appropriate legislation offered to exchange such lands for other lands of the United States, there is no law of the United States authorizing such an exchange, and no act of Congress taken in contemplation of any such exchange, present or future. Therefore the position of our state law that these sections may be used as "bases for indemnity selections provided by law" is without any present efficacy by reason of the fact that there is no law of the United States either authorizing indemnity selections in such cases or authorizing an exchange of lands in any other way.

Id.—Eminent Domain—State Lands Reserved from Sale.—The state statutes do not say that state lands reserved from sale, or state lands not offered for sale, shall not be subject to the right of eminent domain. They declare that all the lands of the state shall be subject to this right, saving such lands alone as are devoted to a public use.

Id.—Public Domain—Exclusive Control of Congress.—The control of the public domain is vested in Congress alone, and Congress only can dispose of the public lands of the United States.

Id.—Ruling of Executive Department—Whether Superior to Adjudication of Court.—The ruling of an executive department of the United States government cannot stand superior to the construction of a federal statute by a federal court.

Id.—Public Service—Necessity of Corporation Engaging in Before Condemning Land.—The law does not contemplate that a corporation organized to render public service must first be engaged in such service before its right to condemn property under the power of eminent domain accrues, and hence its complaint in condemnation proceedings need not show it to be in charge of a public use.

Id.—Complaint in Condemnation Proceedings—Sufficiency in Alleging Purposes.—The fact that such complaint alleged certain purposes of the proceedings not expressly enumerated in section 1238 of the Code of Civil Procedure does not operate against the judgment, when there was no demurrer, and the most of the purposes set forth in the complaint came strictly within the language of the section, and the evidence was ample to sustain the complaint in these respects.

ID.—ARTICLES OF INCORPORATION—POWER TO "ACQUIRE" LANDS IN-
CLUDES RIGHT TO "CONDEMN."—The power "to acquire" property
for the purposes of a public use, given to a public service corporation
by its articles of incorporation, includes the right "to condemn."

ID.—ACTION TO CONDEMN ENTIRE SECTION—SUFFICIENCY OF COM-
PLAINT.—Where the plaintiff in eminent domain seeks to condemn
a whole section of land, not rights of way thereover, it is unneces-
sary for the complaint to conform to the requirements of section
1244 of the Code of Civil Procedure, which is applicable to cases
where a right of way only is sought.

ID.—RESERVE—LOCKED LANDS—TRANSFER BY STATE TO FEDERAL GOVERN-
MENT—ACCEPTANCE BY LAND DEPARTMENT.—The statutes of the
state nowhere contemplate a gift of lands surrounded by United
States forest reserves to the United States, but only an exchange
for equivalent lands. Therefore an unauthorized acceptance by the
United States land department of a listing of such lands by the
state, with no further act upon the part of the United States,
cannot operate to divest or even to impair the title of the state.

ID.—STATE LAND WITHIN FOREST RESERVE—CONDEMNATION NOT OP-
POSED TO INTERESTS OF STATE.—The condemnation of state land,
which is surrounded by United States forest reserves, by a public
service corporation under the power of eminent domain, is not
contrary to public policy and the interest of the state.

APPEAL from a judgment of the Superior Court of Mono
County and from an order refusing a new trial. William S.
Wells, Judge presiding.

The facts are stated in the opinion of the court.

U. S. Webb, Attorney-General, and John T. Nourse, Deputy
Attorney-General, for Appellant.

A. H. Ricketts, Metson, Drew & Mackenzie, and Horatio
Alling, for Respondent.

Percy V. Long, City Attorney of the City and County of
San Francisco, and J. F. English, Assistant City Attorney,
*Amici Curiae.*

HENSHAW, J.—This appeal is from a judgment in favor
of plaintiff in an action in eminent domain and from the order
denying defendant's motion for a new trial.

Plaintiff is a corporation organized under the laws of the state of Nevada. It has complied with the laws of the state of California governing its right to do business herein. By compliance with such laws it has acquired the right to do business in California and to that extent is here domesticated. Whatever controversy may have existed over the right of such a corporation to exercise the power of eminent domain is now laid to rest by the decision of this court in Bank in *San Joaquin etc. Co.* v. *Stevinson,* 164 Cal. 221, [128 Pac. 924], where such right is expressly declared to exist.

The discussion in that case is so full as to relieve from the necessity of doing more than to refer to it.

Plaintiff is a public service corporation. It sought to condemn the land in question for the purpose of preserving and maintaining water-rights, watersheds, and sources, equipping, operating, and maintaining canals, laterals, aqueducts, flumes, tunnels, ditches, pipes, and pipe-lines with all their appurtenances; supplying, selling and distributing water and electric power to mines, farming neighborhoods, cities, towns, villages, and other municipal divisions, and to corporations and individuals; draining, reclaiming and irrigating lands, and equipping, operating, and maintaining ditches, reservoirs, dams, tunnels, levees, viaducts, bridges, excavations, and sites for the collection, storage, sale, and distribution of water; for the operation and maintenance of pumps and pumping plants, electrical lighting and power plants, and electric power lines by means of poles, wires, conduits, and subways. The purposes for which the corporation was organized are those just indicated, and they are most of them purposes for which the right of eminent domain may be exercised. (Code Civ. Proc., sec. 1238.)

The principal contention of the appellant is that this particular section of land is not subject to the exercise of this right. Section 1240 of the Code of Civil Procedure declares that the right of eminent domain may be exercised upon "all lands belonging to the state . . . not appropriated to some public use." Appellant contends (a) that these lands had been devoted to public use, and (b) that they had by the state been withdrawn so as not to be subject to a taking in eminent domain proceedings.

The land is a sixteenth section, title to which passed to the state by virtue of the federal school-land grant. It is a surveyed section, title to which has completely vested in the state. (*Heydenfeldt* v. *Mining Co.*, 93 U. S. 634, [23 L. Ed. 995]; *Cooper* v. *Roberts*, 18 How. 173, [15 L. Ed. 338]; *Hibberd* v. *Slack*, 84 Fed. 571; *Slade* v. *Butte Co.*, 14 Cal. App. 453, [112 Pac. 485].) After this complete vestiture of title in the state, a national forest reservation was created, which within its exterior boundaries included this section 16 in the county of Mono. The situation thus resulting is, that complete title to the land having vested in the state of California before the creation of the forest reserve, that title was in no way affected or impaired by the act of the federal authorities in creating this reserve, any more than would their act affect the rights of any other private proprietor owning land within the delimited boundaries of the reservation. (*Curtain* v. *Benson*, 222 U. S. 78, [56 L. Ed. 102, 32 Sup. Ct. Rep. 31].)

Certain fundamental legal considerations lie at the threshold of the main inquiry presented by this appeal. They are quite obvious and indisputable and may be thus stated: The state of California has declared that any and all of her lands held by her in sovereign proprietorship, excepting such as may be devoted to a public use, may be taken from her by any one qualified so to do under proceedings in eminent domain. (Code Civ. Proc., sec. 1240, subd. 2.) The state of California in this matter has consented to become a party litigant before her own courts, and when brought before the courts in such a proceeding her rights are no other than those of any other private proprietor. (Code Civ. Proc., sec. 1240, subd. 8; Civ. Code, sec. 1001. See *Chicago & N. Ry.* v. *State*, 1 Cal. App. 144, [81 Pac. 971]; *Mitchell* v. *United States*, 9 Pet. 711, [9 L. Ed. 283]; *United States* v. *O'Grady*, 22 Wall. 641, [22 L. Ed. 772]; *Mountain Copper Co.* v. *United States*, 142 Fed. 625, [73 C. C. A. 621]; *Johnston* v. *Stimmel*, 89 N. Y. 117.) The conclusion therefore is necessarily this, that if the land in question still belongs to the state of California, and has not by the state been appropriated to some public use, it is with the state's own permission and invitation subject to be taken in such proceeding.

The creation of a national forest reserve is, as to such lands as are under control of the federal government, a dedication

and an appropriation of these lands to a public use. (*Light
v. United States*, 220 U. S. 523, [55 L. Ed. 570, 31 Sup. Ct.
Rep. 485].) Upon this it is declared in argument that all
lands within the boundaries of such a reservation are likewise
appropriated to a public use. If such lands are held in pri-
vate ownership either as here by the state or by other locators,
pre-emptors or purchasers from the general government, or
from the state, this necessarily cannot be so. The action of
the United States cannot affect and is not designed to affect
lands so held.

If in fact then this land has by the state been devoted to
public use, it cannot be from the mere act of the federal au-
thorities in creating the reservation, but must be found in
some affirmative action by the state itself which alone has title
to and control over this section. It is contended that it is
found in the legislation of this state touching sections 16 and
36 granted to the state under the School Land Act when such
sections have been embraced within the boundaries of a fed-
eral reservation. The legislation of the state upon the subject
is to be found in sections 3398 to 3409, inclusive, of the Po-
litical Code, as affected by a later act of the legislature ap-
proved May 1, 1911. (Stats. 1911, p. 1408.) By section
3408b "all sixteenth and thirty-sixth sections, surveyed and
unsurveyed, which may now or may hereafter be included
within the exterior boundaries of a national reservation, shall
be . . . and are hereby withheld from sale by the state, and
the same shall hereafter be used only as bases for indemnity
selections as in this article provided." The act of 1911, later
in date, modifies this language by a declaration that such
lands "are hereby withdrawn from sale by the state of Cali-
fornia" and that "Sec. 3. Nothing in this act contained shall
be construed as preventing the use of said sixteenth and
thirty-sixth sections as bases for indemnity selections, as pro-
vided by law." Section 3408c provides as follows:

"Whenever there shall exist in the state of California as
may be determined by the surveyor general the right to select
any lands from the United States, for any of the causes or
reasons for which it may now or may hereafter under the
laws of the United States be entitled to make indemnity selec-
tions, the surveyor general shall ascertain from time to time
the number of acres of land to which the state is entitled as

indemnity and shall keep on file a statement showing of what such bases consist.   In determining the bases in lieu of which the state is entitled to indemnity, the surveyor general shall also include all sixteenth and thirty-sixth sections which were surveyed at the time of the withdrawal of such lands from public entry, or at any time thereafter; provided, however, that should the land department of the United States determine that such surveyed sections are improper or invalid bases, then the surveyor general shall not be required thereafter to consider or treat said surveyed sections as valid or any bases for indemnity selections.''

The succeeding section provides for the sale of scrip based upon the state's right to indemnity selections and entitling the purchaser to make such indemnity location.   It is further provided that ''Whenever it is made to appear to the satisfaction of the surveyor general that the base or bases named in any certificate of indemnity or scrip is or are invalid, or will not be accepted by the land department of the United States, the owner and holder thereof may surrender the same to the surveyor general and be entitled to restitution therefor.''   This sufficiently sets forth all of the state law necessary for the present consideration.

The federal law to which these provisions of the state law are manifestly and admittedly addressed are sections 2275 and 2276 of the Revised Statutes of the United States as amended in 1891, [Comp. Stats. 1901, pp. 1381, 1382; 6 Fed. Stats. Ann., pp. 462, 464].   In substance those sections declare that when any of these school sections so conveyed to a state are lost to the state, either by superior claims of homestead or preemption settlers, or because they are mineral lands, or because they are included within any Indian, military, or other reservation, or because they are otherwise disposed of by the United States ''other lands of equal acreage are hereby appropriated and granted and may be selected by said state in lieu of such as may be thus'' lost.   By appellant it is contended that notwithstanding the title to such a section has absolutely vested in it before the creation of a forest federal reservation, it has elected to surrender such section to the United States, seeking indemnity and compensation therefor under the federal indemnity grant provided for in the above cited sections of the federal statutes.   And further the state contends that this

federal grant is broad enough to include such selections as indemnity selections and that the interior department of the United States so construes the law. Furthermore, that the state has taken the appropriate steps in the various federal land-offices to accomplish this desired result, so that the present *status* of these lands is that the state has offered them to the United States in exchange for other equivalent public lands belonging to the general government. Therefore, the conclusion is that the state has, at least in equity, parted with its title, which title in equity is reinvested in the United States.

If appellant's position in this matter be sound there is an end to the controversy and the trial court erred in awarding a judgment in condemnation. But while one party may offer to contract, the assent of the other party to the offer must in some way be evidenced before any rights, legal or equitable, can spring into existence. As it is unquestioned that the control of the public domain is vested in Congress alone, and that only Congress can dispose of the public lands of the United States, the first inquiry must be directed to ascertain what Congress has done in the matter. It is conceded that all that it has done—the only provision that it has made for a case such as this—is disclosed by the language of the federal statutes above cited. But herein it is to be observed that all that Congress had in contemplation in passing these statutes was to indemnify states and territories for losses of school sections, which losses might befall the state for the reasons therein given. Further, it is to be observed that the only grant which Congress made was of lands to make good such losses—lieu lands by way of indemnity. And finally it is to be noted that the statutes of this state above referred to treat and speak of the acquisition by the state of other lands solely by way of indemnity. This language is strictly appropriate to those school sections lost to the state for the various reasons indicated, as by the prior right of settlers or purchasers, as by the fact that they were mineral lands, as by the fact that they were within declared military, Indian, forest or other national reservations, and as by the fact that before survey they were put within such reservations. But indemnification means nothing other than the making good of a loss. (*Slade* v. *County of Butte,* 14 Cal. App. 453, [112 Pac. 485]; *Johnston* v. *Morris,* 72 Fed. 890, [19 C. C. A. 229].) The federal

grant was strictly an indemnity grant and nothing else. Such would appear manifest from a reading of the language of the federal statutes and such is the decision of the circuit court of the United States in the carefully considered and elaborately reasoned case of *Hibberd* v. *Slack,* 84 Fed. 571, and the conclusion necessarily follows that a section such as this may not be *exchanged* with the United States under the indemnity grant provided for by section 2275 of the Revised Statutes of 1891 [Comp. Stats. 1901, p. 1381, 6 Fed. Stats. Ann. p. 462]. But against this it is urged that notwithstanding the decision of the United States circuit court upon this very federal statute, we should ignore that decision and follow the rulings of the interior department, which rulings have permitted such exchanges. In this behalf it is argued that the secretary of the interior is himself vested with judicial functions and that his construction, or his solicitor's construction of the statute, should be preferred and adopted. It is the duty of this court to adopt the construction of the statutes of the United States given by the courts of the United States. We have in at least the two cases above cited declarations by those courts as to the scope and meaning of the indemnity grant in question. That grant does not contemplate an exchange of lands between the state and the United States, but the making good to the state of a loss which it may sustain in a failure to get land which the United States attempted to grant to it. It is a novel proposition to say that the ruling of an executive department should stand superior on the construction of a federal statute to the solemn adjudication of a court charged with the express duty of announcing the meaning of a statute in a litigated controversy over that meaning. It certainly requires no citation of authority to show that the construction so placed by a federal court upon a federal statute is superior to such a departmental ruling. And equally certain is it that though the interior department may elect to ignore the decisions of the courts of the United States, it is still not within the power of such a department to give, to sell or exchange the public domain without authority from Congress. And if, as the federal courts have decided, Congress has not given the department such authority, the department's efforts and acts in the exchange of such lands, when brought before a judicial

tribunal, will be declared null and void. The conclusion upon this branch of the consideration therefore necessarily must be that while the state of California has by appropriate legislation offered to exchange such lands for other lands of the United States, there is no law of the United States authorizing such an exchange, and no act of the Congress of the United States taken in contemplation of any such exchange, present or future. Therefore the position of our state law (Act of 1911) that these sections may be used as "bases for indemnity selections provided by law" is without any present efficacy by reason of the fact that there is no law of the United States either authorizing indemnity selections in such cases, or authorizing an exchange of lands in any other way. To the further argument upon this matter, that the state has already sold scrip based upon such proposed indemnity selections, the answer is found in the state statute above quoted. The purchaser is entitled to a restitution of his money upon the failure of the United States to make provision for the exchange.

A further argument upon the general subject is that the state has withdrawn such sections from sale and that therefore the right of eminent domain may not be exercised regarding them. This, however, cannot be, in contemplation of the general law touching the right of eminent domain. Our statutes do not say that state lands reserved from sale, or state lands not offered for sale, shall not be subject to the right of eminent domain. They declare that all the lands of the state shall be subject to this right, saving such lands alone as are devoted to a public use. The state might today have no laws for the sale of its proprietary lands. But this would not affect the power to exercise the right of eminent domain as accorded by the statutes of the state. The question of sale or nonsale imports a foreign element into the discussion. The sole defense in this respect which may be made by the state, conceding that it owns the land in controversy, is that the land has been appropriated to a public use. That this land was not so appropriated we have discussed at length. In addition to that, the concessions of the pleadings declare that no part of it is so devoted.

The foregoing cover the principal contentions advanced by appellant against the judgment given herein. It urges cer-

tain minor contentions, as that the complaint is insufficient because it does not show plaintiff to be in charge of a public use. But plaintiff is organized as a public service corporation and must acquire the utilities to perform that service by purchase or by condemnation. The law does not contemplate that such a corporation must first be engaged in public service before the right of condemnation attaches. (*Northern Light Co.* v. *Stacher,* 13 Cal. App. 404, [109 Pac. 896]; *Tuolumne Water Co.* v. *Frederick,* 13 Cal. App. 498, [110 Pac. 134].) Its articles of incorporation are broad enough to entitle it on behalf of recognized public uses to commence and maintain the action. Nor does the fact that certain of the purposes declared in the complaint may not be expressly enumerated in section 1238 of the Code of Civil Procedure operate against the judgment. Most of the purposes set forth in the complaint come strictly within the language of the section, and the evidence was ample to sustain the complaint in these respects. There was no demurrer to the complaint, and it is immaterial that certain of the asserted purposes do not fall within the list enumerated in the code. (*Central Pac. R. Co.* v. *Feldman,* 152 Cal. 306, [92 Pac. 849]; *Northern Light Co.* v. *Stacher,* 13 Cal. App. 404, [109 Pac. 896].) The argument is advanced that the complaint shows that the articles of incorporation empowered the plaintiff to *"acquire"* lands and property rights for the purposes of public use. But it is argued that the right to acquire does not include the right to condemn. Yet section 1001 of the Civil Code uses this very word in declaring that "any person may . . . acquire private property for any use specified in section one thousand two hundred and thirty-eight" of the Code of Civil Procedure by proceedings in eminent domain. The complaint is sufficient. It contains all of the allegations required by section 1244 of the Code of Civil Procedure. It declares that the use sought of the lands is a public use and that the plaintiff is intrusted with and in charge of such a public use. The action seeks to condemn the whole section and not rights of way thereover. It was unnecessary therefore that the complaint should conform to the requirements of section 1244 of the Code of Civil Procedure, which is applicable to cases where a right of way only is sought. It was not error to award to the plaintiff the whole of the section. Uncontradicted evi-

dence was introduced showing that because of the topography of the country and the climatic conditions and other reasons the whole section, as well as other adjoining properties, are necessary to the successful accomplishment of the objects and purposes of the plaintiff as a public service corporation. (*City of Santa Ana* v. *Gildmacher*, 133 Cal. 395, [63 Pac. 883]; *Spring Valley Co.* v. *Drinkhouse*, 92 Cal. 532, [28 Pac. 681]; *Los Angeles* v. *Pomeroy*, 124 Cal. 597, [57 Pac. 585]; *Central Pac. R. Co.* v. *Feldman*, 152 Cal. 306, [92 Pac. 849].)

It is further argued that owing to the conditions which have been shown to exist concerning the land in controversy, complete justice cannot be done without bringing into court the United States as a party defendant. But this of course, however desirable, is beyond the power of the state court to do. (*Case* v. *Terrell*, 78 U. S. 199, [20 L. Ed. 134]; *Kawananakoa* v. *Polyblank*, 205 U. S. 349, 51 L. Ed. 834, 27 Sup. Ct. Rep. 526]; *Kansas* v. *Colorado*, 206 U. S. 46, [51 L. Ed. 956, 27 Sup. Ct. Rep. 655]; *Sawyer* v. *Osterhaus*, 195 Fed. 655; *The Davis*, 10 Wall. 15, [19 L. Ed. 875]; *Buckley* v. *United States*, 196 Fed. 429; *Oregon* v. *Hitchcock*, 202 U. S. 60, [50 L. Ed. 935, 26 Sup. Ct. Rep. 568]; *Minnesota* v. *Hitchcock*, 185 U. S. 373, [46 L. Ed. 954; 22 Sup. Ct. Rep. 650].) The United States can be sued only in such cases and in such courts as are permitted by its own laws. Therefore the provision of subdivision 3, section 1240, of the Code of Civil Procedure, by which the state declares that the lands "owned or held by the United States in trust or otherwise" may be subjected to proceedings in eminent domain, stands upon our statute books without the slightest efficacy until the United States government itself shall have authorized the states to bring itself and its lands into their courts.

Running through many of the propositions which appellant has advanced is an argument touching the desirability of giving effect to this attempted retransfer of lands to the United States. Herein it is pointed out that it is most advantageous to the United States that it should hold title to all lands within its reservations, that there may be simplicity and uniformity in their control by the United States without friction or interference with the rights of private owners, and, second, that such reserve-locked lands are of less value to the state than would be equivalent lands not surrounded

by United States lands under federal reserve.  Again it is said that the state, if allowed to sell scrip upon the basis of such indemnity selections, would reap a larger profit than it would from the sale of such inclosed school sections.  And finally it is asserted that by force of the language of section 3406a of the Political Code it should be held that the title of the state should be decreed to have vested in the United States at the date of the state's listing.  This last proposition meets with the immediate answer that the state laws nowhere contemplate a gift to the United States of any of these lands. Every word of our law contemplates an exchange for equivalent lands and it is therefore untenable to hold that an unauthorized acceptance by the United States land department of such listing by the state, with no further act upon the part of the United States, for the reasons already given, can operate to divest or even to impair the title of the state.

But on the general argument we think that the true interests of the state are quite the opposite of those declared in the brief of the attorney-general.  One familiar with the constitutional history of the United States need not be reminded of the jealousy with which, before the adoption of the present constitution and during the sessions of the continental Congress and the existence of the articles of confederation, the original states, and particularly Virginia, in their cessions of lands to the United States guarded their own rights and limited the powers of the United States over them, until in October, 1780, Congress resolved that the lands which may be ceded to the United States by any particular state shall be disposed of for the common benefit of the United States and be settled and formed into distinct republican states, which shall become members of the federal union, and have the same rights to sovereignty, freedom, and independence as the other states.  The fundamental proposition assented to by the United States upon which these cessions were based was that the public lands within new states, existing or to be created, should be disposed of, sold, for the benefit of the United States, for the reason that the states believed it would be injurious to their sovereign rights that any large areas of land within their boundaries should be permanently beyond their taxing power and control and within the sovereign jurisdiction of another power.  Further, it is to be remembered,

that all new states were to be admitted to the Union upon terms of exact equality with all other states, and the act of admission of the state of California declared that ''the state of California shall be one and is hereby declared to be one of the United States of America and admitted into the Union on an equal footing with the original states in all respects whatever.  The people of said state shall never interfere with the primary disposal of the public lands within its limits.'' In the case of *Pollard's Lessee* v. *Hagan,* 3 How. 212, [11 L. Ed. 565], the supreme court of the United States with great learning discusses these contracts between the several states and the United States and the meaning and force of the constitutional provisions thereafter passed.  It is there declared as to the government lands within such states that the United States never held any municipal sovereignty, jurisdiction, or right of soil in and to their territory, or in and to the territory of any of the new states, excepting the right over them of executing the trust, which trust was to provide for their disposition by cessions or sale.  It is further held that every new state comes into the Union upon terms of equality with all other states, and such an equality cannot exist if in one state it exercises sovereign powers over the lands, while in another it has disposed of such lands, or in the execution of its trust must dispose of them.  In *Coyle* v. *Smith,* 221 U. S. 559, [55 L. Ed. 853, 31 Sup. Ct. Rep. 688], these doctrines are reasserted and affirmed, and the power of the United States to pass any law which will create inequality between the states has repeatedly by the supreme court of the United States itself been declared to be void and of no effect.  (*New Orleans* v. *De Armas,* 9 Pet. 224, [9 L. Ed. 109] ; *Groves* v. *Slaughter,* 15 Pet. 449, [10 L. Ed. 800] ; *Illinois Central R. R.* v. *Illinois,* 146 U. S. 387, [36 L. Ed. 1018, 13 Sup. Ct. Rep. 110] ; *United States* v. *McBratney,* 104 U. S. 621, [45 L. Ed. 1032, 21 Sup. Ct. Rep. 924] ; *Hardin* v. *Shedd,* 190 U. S. 508, [47 L. Ed. 1156, 23 Sup. Ct. Rep. 685] ; *United States* v. *Winans,* 198 U. S. 371, [49 L. Ed. 1089, 27 Sup. Ct. Rep. 662].)

We are of course not unmindful of the decisions of the supreme court of the United States, such as *Camfield* v. *United States,* 167 U. S. 524, [42 L. Ed. 260, 17 Sup. Ct. Rep. 864], *Kansas* v. *Colorado,* 206 U. S. 89, [51 L. Ed. 956, 27 Sup.

Ct. Rep. 655], and *Light* v. *United States,* 220 U. S. 523, [55 L. Ed. 570, 31 Sup. Ct. Rep. 485], which declare that within the governmental trust to "dispose" of its public lands vast areas of them within existing states may be taken from the dominion and control of the state and placed in perpetual reserve, and that the execution of the trust under which Congress holds these lands rests with Congress alone. Whether inconsistency and hostility exist between this latter line of decisions and that headed by *Pollard's Lessee* v. *Hagan,* the supreme court of the United States itself in due time will declare. But here we desire to point out that while the state of California was admitted as a sovereign state of the Union upon equal terms with all the other states, and while it has been judicially declared that an essential part of that equality is the disposition of the public lands within the state, to the end that the revenues by taxation therefrom and the control over them may be vested in the state, we have in California a withdrawal by the United States from sale and a placing in reserves of one-third of the area of the whole state—an area greater than the combined territory of New Hampshire, Vermont, Massachusetts, Connecticut, Rhode Island, New Jersey, and Maryland. Not this alone, but we have in these withdrawals a refusal upon the part of the United States to yield to the state of California control over its natural sources of wealth. Its forests, its mines, its oil-bearing lands, its power sites and possibilities, have been withheld by the United States, which proposes to exercise over them, and is exercising over them, the "municipal sovereignty" which the supreme court of the United States in *Pollard's Lessee* v. *Hagan* declared not to exist. If at the time of the proposed cession of its lands by Virginia, Congress had declared its intent to be that which it has actually executed in the state of California, little doubt can be entertained as to the answer which Virginia would have made. It is indeed a departure from the accepted construction of these constitutional provisions to have it said that the United States may, as here, withdraw from state use one-third of the area of a sovereign state, forever deny to the state the sovereign power of taxation and control over these lands, and develop and exploit them under its own rules and regulations for the enrichment of its own treasury. And so, coming to the specific section of land

here under consideration, if it has possibilities of water storage and power development, certainly it is to the interest of the state that these potentialities should be developed in the interest of its citizens and the revenue derived therefrom by rates, tolls, and taxation go into its own treasury, rather than to witness them lying undeveloped and unimproved, or, if improved at all, improved for the enrichment of the national treasury. This is meant to convey no criticism of true conservation of natural resources; but it is a simple declaration of a manifest fact that in a state such as California, a large part of whose territory and whose natural resources are taken away from state control, the denial of the right of taxation on such lands, the erection of an *imperium in imperio,* are developments of governmental ideas not dreamed of at the time of the adoption of the constitution, nor at the time of the decision of *Pollard's Lessee* v. *Hagan.* And in the state of California the cause of conservation would not suffer if intrusted to the state itself.

Finally it may be said that if the state shall believe its rights or interests to be affected by the adoption of the decisions of the federal courts in the construction of the federal statute, which is indisputably a matter of much moment, the path is clear to the supreme court of the United States, where the true and final construction of the statute will be given and all doubts put to rest.

The judgment appealed from is therefore affirmed.

Shaw, J., Lorigan, J., and Melvin, J., concurred.

Rehearing denied.

In denying a rehearing the court rendered the following opinion on February 19, 1914:

THE COURT.—The opinion in the above entitled case discloses that the United States has no interest, legal or equitable, in the land in controversy to call for its appearance in this controversy, and, further, if it had any such right, those rights would not be impaired by its nonappearance. For this reason the following paragraph in the opinion is unnecessary and is therefore eliminated:

"It is further argued that, owing to the conditions which have been shown to exist concerning the land in controversy, complete justice cannot be done without bringing into court the United States as a party defendant. But this of course, however desirable, is beyond the power of the state court to do. (*Case* v. *Terrell,* 78 U. S. 199, [20 L. Ed. 134]; *Kawananakoa* v. *Polyblank,* 205 U. S. 349, [51 L. Ed. 834, 27 Sup. Ct. Rep. 526]; *Kansas* v. *Colorado,* 206 U. S. 46, [51 L. Ed. 956, 27 Sup. Ct. Rep. 655]; *Sawyer* v. *Osterhaus,* 195 Fed. 655; *The Davis,* 10 Wall. 15, [19 L. Ed. 875]; *Buckley* v. *United States,* 196 Fed. 429; *Oregon* v. *Hitchcock,* 202 U. S. 60, [50 L. Ed. 935, 26 Sup. Ct. Rep. 568]; *Minnesota* v. *Hitchcock,* 185 U. S. 373, [46 L. Ed. 954, 22 Sup. Ct. Rep. 650].) The United States can be sued only in such cases and in such courts as are permitted by its own laws. Therefore the provision of subdivision 3, section 1240 of the Code of Civil Procedure, by which the state declares that the lands 'owned or held by the United States in trust or otherwise' may be subjected to proceedings in eminent domain, stands upon our statute books without the slightest efficacy until the United States government itself shall have authorized the states to bring itself and its lands into their courts."

The petition for a rehearing is denied.