(Slip Opinion) OCTOBER TERM, 2011 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PPL MONTANA, LLC *v.* MONTANA

### CERTIORARI TO THE SUPREME COURT OF MONTANA

No. 10–218.  Argued December 7, 2011—Decided February 22, 2012

Petitioner PPL Montana, LLC (PPL), owns and operates hydroelectric facilities in Montana.  Ten of its facilities are located on riverbeds underlying segments of the Missouri, Madison, and Clark Fork Rivers.  Five hydroelectric dams on the Upper Missouri River are along the Great Falls reach, including on the three tallest waterfalls; and PPL's two other dams on that river are in canyons on the Stubbs Ferry stretch.  These, together with two dams located in steep canyons on the Madison River, are called the Missouri-Madison project.  The Thompson Falls project is a facility on the Clark Fork River.  Both projects are licensed by the Federal Energy Regulatory Commission.  PPL's facilities have existed for many decades, some for over a century.  Until recently, Montana, though aware of the projects' existence, sought no rent for use of the riverbeds.  Instead, the understanding of PPL and the United States is that PPL has paid rents to the United States.  In 2003, parents of Montana schoolchildren filed a federal suit, claiming that PPL's facilities were on riverbeds that were state owned and part of Montana's school trust lands.  The State joined the suit and, for the first time, sought rents from PPL for its use of the riverbeds.  That case was dismissed, and PPL and other power companies filed a state-court suit, claiming that Montana was barred from seeking compensation for PPL's riverbed use.  Montana counterclaimed, contending that under the equal-footing doctrine it owns the riverbeds and can charge rent for their use.  The trial court granted Montana summary judgment as to navigability for purposes of determining riverbed title and ordered PPL to pay Montana $41 million in rent for riverbed use between 2000 and 2007.  The Montana Supreme Court affirmed.  Adopting a liberal construction of the navigability test, it discounted this Court's approach of considering the navigability of particular river segments for purposes of deter-

mining whether a State acquired title to the riverbeds underlying those segments at the time of statehood. Instead, the Montana court declared the river stretches in question to be short interruptions of navigability that were insufficient as a matter of law to find nonnavigability, since traffic had circumvented those stretches by portage. Based on evidence of present-day, recreational use of the Madison River, the court found that river navigable as a matter of law at the time of statehood.

*Held:* The Montana Supreme Court's ruling that Montana owns and may charge for use of the riverbeds at issue was based on an infirm legal understanding of this Court's rules of navigability for title under the equal-footing doctrine. Pp. 10–26.

(a) The rule that the States, in their capacity as sovereigns, hold "title in the soil of rivers really navigable," *Shively* v. *Bowlby,* 152 U. S. 1, 31, has federal constitutional significance under the equal-footing doctrine. Pursuant to that doctrine, upon its date of statehood, a State gains title within its borders to the beds of waters then navigable. It may allocate and govern those lands according to state law subject only to the United States' power "to control such waters for purposes of navigation in interstate and foreign commerce." *United States* v. *Oregon,* 295 U. S. 1, 14. The United States retains title vested in it before statehood to land beneath waters not then navigable. To be navigable for purposes of title under the equal-footing doctrine, rivers must be "navigable in fact," meaning "they are used, or are susceptible of being used, . . . as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *The Daniel Ball*, 10 Wall. 557, 563. This formulation has been used to determine questions of waterbed title under the equal-footing doctrine. See *United States* v. *Utah*, 283 U. S. 64, 76. Pp. 10–14.

(b) The Montana Supreme Court erred in its treatment of the question of river segments and portage. To determine riverbed title under the equal-footing doctrine, this Court considers the river on a segment-by-segment basis to assess whether the segment of the river, under which the riverbed in dispute lies, is navigable or not. See, *e.g., Utah*, *supra*, at 77. The State Supreme Court erred in discounting this well-settled approach. A key justification for sovereign ownership of navigable riverbeds is that a contrary rule would allow private riverbed owners to erect improvements on the riverbeds that could interfere with the public's right to use the waters as a highway for commerce. Because commerce could not have occurred on segments nonnavigable at the time of statehood, there is no reason to deem those segments owned by the State under the equal-footing doctrine. Practical considerations also support segmentation. Physi-

cal conditions affecting navigability vary over the length of a river and provide a means to determine appropriate start points and end points for disputed segments. A segment approach is also consistent with the manner in which private parties seek to establish riverbed title. Montana cannot suggest that segmentation is inadministrable when the state courts managed to apportion the underlying riverbeds for purposes of determining their value and PPL's corresponding rents. The State Supreme Court's view that the segment-by-segment approach does not apply to short interruptions of navigability is not supported by this Court's *Utah* decision. Even if the law might find some nonnavigable segments so minimal that they merit treatment as part of a longer, navigable reach, it is doubtful that the segments in this case would meet that standard. Applying its "short interruptions" approach, the State Supreme Court found the Great Falls reach navigable because it could be managed by way of land route portage, as done by Lewis and Clark. But a portage of even one day would demonstrate the need to bypass a nonnavigable river segment. Thus, the State Supreme Court was wrong to conclude, with respect to the Great Falls reach and other disputed stretches, that portages were insufficient to defeat a navigability finding. In most cases, they are, because they require transportation over land rather than over the water. This is the case at least as to the Great Falls reach. In reaching a contrary conclusion, the State Supreme Court misapplied *The Montello*, 20 Wall. 430. There, portage was considered in determining whether a river was part of a channel of interstate commerce for federal regulatory purposes. *The Montello* does not control the outcome where the quite different concerns of the riverbed title context apply. Portages may defeat navigability for title purposes, and do so with respect to the Great Falls reach. Montana does not dispute that overland portage was necessary to traverse that reach, and the trial court noted the waterfalls had never been navigated. The Great Falls reach, at least from the head of the first waterfall to the foot of the last, is not navigable for purposes of riverbed title under the equal-footing doctrine. There is also a significant likelihood that some of the other river stretches in dispute fail this federal navigability test. The ultimate decision as to these other disputed river stretches is to be determined, in the first instance, by the Montana courts on remand, which should assess the relevant evidence in light of the principles discussed here. Pp. 14–21.

(c) The Montana Supreme Court further erred as a matter of law in relying on evidence of present-day, primarily recreational use of the Madison River. Navigability must be assessed as of the time of statehood, and it concerns a river's usefulness for " 'trade and travel.' " *Utah*, 283 U. S., at 75–76. River segments are navigable if they

Syllabus

"'[were]'" used and if they "'[were] susceptible of being used'" as highways of commerce at the time of statehood. *Id.,* at 76. Evidence of recreational use and poststatehood evidence may bear on susceptibility of commercial use at the time of statehood. See *id.,* at 82–83. In order for present-day use to have a bearing on navigability at statehood, (1) the watercraft must be meaningfully similar to those in customary use for trade and travel at the time of statehood, and (2) the river's poststatehood condition may not be materially different from its physical condition at statehood. The State Supreme Court offered no indication that it made these necessary findings. Pp. 21–24.

(d) Because this analysis is sufficient to require reversal here, the Court declines to decide whether the State Supreme Court also erred as to the burden of proof regarding navigability. P. 24.

(e) Montana's suggestion that denying the State title to the disputed riverbeds will undermine the public trust doctrine—which concerns public access to the waters above those beds for navigation, fishing, and other recreational uses—underscores its misapprehension of the equal-footing and public trust doctrines. Unlike the equal-footing doctrine, which is the constitutional foundation for the navigability rule of riverbed title, the scope of the public trust over waters within the State's borders is a matter of state law, subject to federal regulatory power. Pp. 24–25.

(f) This Court does not reach the question whether, by virtue of Montana's sovereignty, neither laches nor estoppel could apply to bar the State's claim. Still, the reliance by PPL and its predecessors in title on the State's long failure to assert title to the riverbeds is some evidence supporting the conclusion that the river segments over those beds were nonnavigable for purposes of the equal-footing doctrine. Pp. 25–26.

2010 MT 64, 355 Mont. 402, 229 P. 3d 421, reversed and remanded.

KENNEDY, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–218

_____

## PPL MONTANA, LLC, PETITIONER *v.* MONTANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF MONTANA

[February 22, 2012]

JUSTICE KENNEDY delivered the opinion of the Court.

This case concerns three rivers which flow through Montana and then beyond its borders. The question is whether discrete, identifiable segments of these rivers in Montana were nonnavigable, as federal law defines that concept for purposes of determining whether the State acquired title to the riverbeds underlying those segments, when the State entered the Union in 1889. Montana contends that the rivers must be found navigable at the disputed locations. From this premise, the State asserts that in 1889 it gained title to the disputed riverbeds under the constitutional equal-footing doctrine. Based on its title claims, Montana sought compensation from PPL Montana, LLC, a power company, for its use of the riverbeds for hydroelectric projects. The Montana courts granted summary judgment on title to Montana, awarding it $41 million in rent for the riverbeds for the period from 2000 to 2007 alone. That judgment must be reversed.

## I

The three rivers in question are the Missouri River, the Madison River, and the Clark Fork River. The Missouri and the Madison are on the eastern side of the Continen-

tal Divide. The Madison flows into the Missouri, which then continues at length to its junction with the Mississippi River. The Clark Fork River is on the western side of the Continental Divide. Its waters join the Columbia River system that flows into the Pacific Ocean. Each river shall be described in somewhat more detail.

### A

The Missouri River originates in Montana and traverses seven States before a point just north of St. Louis where it joins the Mississippi. 19 Encyclopedia Americana 270 (int'l ed. 2006). If considered with the continuous path formed by certain streams that provide the Missouri River's headwaters, the Missouri is over 2,500 miles long, the longest river in the United States. *Ibid.* The Missouri River's basin (the land area drained by the river) is the second largest in the Nation, surpassed only by the Mississippi River basin of which it is a part. Rivers of North America 427 (A. Benke & C. Cushing eds. 2005) (hereinafter Rivers of North America). As a historical matter, the river shifted and flooded often, and contained many sandbars, islands, and unstable banks. *Id.,* at 432–433. The river was once described as one of the most "variable beings in creation," as "inconstant [as] the action of the jury," Sioux City Register (Mar. 28, 1868); and its high quantity of downstream sediment flow spawned its nickname, the "Big Muddy," Rivers of North America 433.

The upstream part of the Missouri River in Montana, known as the Upper Missouri River, is better characterized as rocky rather than muddy. While one usually thinks of the Missouri River as flowing generally south, as indeed it does beginning in North Dakota, the Upper Missouri in Montana flows north from its principal headwaters at Three Forks, which is located about 4,000 feet above sea level in the Rocky Mountain area of southwestern Montana. It descends through scenic mountain ter-

rain including the deep gorge at the Gates of the Mountains; turns eastward through the Great Falls reach, cascading over a roughly 10-mile stretch of cataracts and rapids over which the river drops more than 400 feet; and courses swiftly to Fort Benton, a 19th-century fur trading post, before progressing farther east into North Dakota and on to the Great Plains. 19 Encyclopedia Americana, *supra*, at 270; 8 New Encyclopaedia Britannica 190 (15th ed. 2007) (hereinafter Encyclopaedia Britannica); 2 Columbia Gazetteer of the World 2452 (2d ed. 2008) (hereinafter Columbia Gazetteer); F. Warner, Montana and the Northwest Territory 75 (1879). In 1891, just after Montana became a State, the Upper Missouri River above Fort Benton was "seriously obstructed by numerous rapids and rocks," and the 168-mile portion flowing eastward "[f]rom Fort Benton to Carroll, Mont., [was] called the rocky river." Annual Report of the Chief of Engineers, U. S. Army (1891), in 2 H. R. Exec. Doc. No. 1, 52d Cong., 1st Sess., pt. 2, pp. 275–276 (1891) (hereinafter H. R. Exec. Doc.).

The Great Falls exemplify the rocky, rapid character of the Upper Missouri. They consist of five cascade-like waterfalls located over a stretch of the Upper Missouri leading downstream from the city of Great Falls in mid-western Montana. The waterfall farthest downstream, and the one first encountered by Meriwether Lewis and William Clark when they led their remarkable expedition through the American West in 1805, is the eponymous "Great Falls," the tallest of the five falls at 87 feet. W. Clark, Dear Brother: Letters of William Clark to Jonathan Clark 109, n. 5 (J. Holmberg ed. 2002) (hereinafter Dear Brother). Lewis recorded observations of this "sublimely grand specticle":

> "[T]he whole body of water passes with incredible swiftness. . . . over a precipice of at least eighty feet . . . . [T]he irregular and somewhat projecting rocks

below receives the water . . . and brakes it into a per-
fect white foam which assumes a thousand forms in
a moment sometimes flying up in jets . . . [that] are
scarcely formed before large roling bodies of the same
beaten and foaming water is thrown over and conceals
them. . . . [T]he [rainbow] reflection of the sun on the
sprey or mist . . . adds not a little to the beauty of this
majestically grand senery." The Lewis and Clark
Journals: An American Epic of Discovery 129 (G.
Moulton ed. 2003) (hereinafter Lewis and Clark Jour-
nals); The Journals of Lewis and Clark 136–138 (B.
DeVoto ed. 1981).

If one proceeds alongside the river upstream from Great
Falls, as Lewis did in scouting the river for the expedition,
the other four falls in order are "Crooked Falls" (19 feet
high); "Rainbow Falls" (48 feet), which Lewis called "one of
the most bea[u]tifull objects in nature"; "Colter Falls" (7
feet), and "Black Eagle Falls" (26 feet). See Lewis and
Clark Journals 131–132; Dear Brother 109, n. 5; P. Cut-
right, Lewis & Clark: Pioneering Naturalists 154–156
(2003). Despite the falls' beauty, Lewis could see that
their steep cliffs and swift waters would impede progress
on the river, which had been the expedition's upstream
course for so many months. The party proceeded over a
more circuitous land route by means of portage, circum-
venting the Great Falls and their surrounding reach of
river before returning to travel upon the river about a
month later. See Lewis and Clark Journals 126–152.

The Upper Missouri River, both around and further
upstream of the Great Falls, shares the precipitous and
fast-moving character of the falls themselves. As it moves
downstream over the Great Falls reach, a 17-mile stretch
that begins somewhat above the head of Black Eagle Falls,
the river quickly descends about 520 feet in elevation, see
*Montana Power Co.* v. *Federal Power Comm'n,* 185 F. 2d

491 (CADC 1950); 2010 MT 64, ¶¶29–30, 108–109, 355 Mont. 402, 416, 442, 229 P. 3d 421, 433, 449, dropping over 400 feet within 10 miles from the first rapid to the foot of Great Falls, Parker, Black Eagle Falls Dam, 27 Transactions of the Am. Soc. of Civil Engineers 56 (1892). In 1879, that stretch was a "constant succession of rapids and falls." Warner, *supra*, at 75; see also 9 The Journals of the Lewis & Clark Expedition 171 (G. Moulton ed. 1995) (hereinafter Journals of the Lewis & Clark Expedition) ("a continued rapid the whole way for 17 miles"). Lewis noted the water was so swift over the area that buffalo were swept over the cataracts in "considerable quantities" and were "instantly crushed." Lewis and Clark Journals 136–137. Well above the Great Falls reach, the Stubbs Ferry stretch of the river from Helena to Cascade also had steep gradient and was "much obstructed by rocks and dangerous rapids." Report of the Secretary of War, 2 H. R. Doc. No. 2, 54th Cong., 1st Sess., pt. 1, p. 301 (1895).

B

The second river to be considered is the Madison, one of the Missouri River's headwater tributaries. Named by Lewis and Clark for then-Secretary of State James Madison, the Madison River courses west out of the Northern Rocky Mountains of Wyoming and Montana in what is now Yellowstone National Park, then runs north and merges with the Jefferson and Gallatin Rivers at Three Forks, Montana, to form the Upper Missouri. Lewis and Clark Journals 158; Rivers of North America 459; 7 Encyclopaedia Britannica 658; 2 Columbia Gazetteer 2242. Along its path, the Madison River flows through two lakes artificially created by dams built in canyons: Hebgen Lake and Ennis Lake. Federal Writers' Project of the Work Projects Administration, Montana: A State Guide Book 356 (J. Stahlberg ed. 1949); R. Aarstad, E. Arguimbau, E. Baumler, C. Porsild, & B. Shovers, Montana Place Names

from Alzada to Zortman: A Montana Historical Society Guide 166 (2009).

### C

The third river at issue in this case is the Clark Fork. That river, which consists in large part of "long, narrow streams confined by mountainous terrain," rises at an elevation of about 5,000 feet in the Silver Bow Mountains of southwestern Montana. 3 Encyclopaedia Britannica 352; Dept. of Interior, U. S. Geological Survey, J. Stevens & F. Henshaw, Surface Water Supply of the United States, 1907–8, Water-Supply Paper 252, pp. 81–82 (1910). The river flows northward for about 40 miles; turns northwest for a stretch; then turns abruptly northeast for a short stint, by which time it has descended nearly 2,500 feet in altitude. It then resumes a northwestward course until it empties into Lake Pend Oreille in northern Idaho, out of which flows a tributary to the Columbia River of the Pacific Northwest. *Ibid.;* 1 Columbia Gazetteer 816. The Clark Fork is "one of the wildest and most picturesque streams in the West," marked by "many waterfalls and boxed gorges." Federal Writers' Projects of the Works Progress Administration, Idaho: A Guide in Word and Picture 230 (2d ed. 1950).

Lewis and Clark knew of the Clark Fork River but did not try to navigate it, in part because the absence of salmon in one of its tributaries made Lewis believe "'there must be a considerable fall in [the river] below.'" H. Fritz, The Lewis and Clark Expedition 38–39 (2004). This was correct, for shortly before the Clark Fork exits to Idaho from the northwest corner of Montana, "the waters of the river dash madly along their rocky bed," dropping over 30 feet in a half-mile as they rush over falls and rapids including a "foaming waterfall" now known as Thompson Falls. O. Rand, A Vacation Excursion: From Massachusetts Bay to Puget Sound 176–177 (1884); C. Kirk, A

History of the Montana Power Company 231 (2008).

## II

Petitioner PPL Montana, LLC (PPL), owns and operates hydroelectric facilities that serve Montana residents and businesses. Ten of its facilities are built upon riverbeds underlying segments of the Upper Missouri, Madison, and Clark Fork Rivers. It is these beds to which title is disputed.

On the Upper Missouri River, PPL has seven hydroelectric dams. Five of them are along the Great Falls reach, including on the three tallest falls; and the other two are in canyons upstream on the Stubbs Ferry stretch. See K. Robison, Cascade County and Great Falls 56 (2011); Aarstad et al., *supra*, at 125, 119, 145–146. On the Madison River, two hydroelectric dams are located in steep canyons. On the Clark Fork River, a hydroelectric facility is constructed on the Thompson Falls.

The dams on the Upper Missouri and Madison are called the Missouri-Madison project. The Thompson Falls facility is called the Thompson Falls project. Both projects are licensed by the Federal Energy Regulatory Commission. PPL acquired them in 1999 from its predecessor, the Montana Power Company. 355 Mont., at 405–406, 229 P. 3d, at 426.

PPL's power facilities have existed at their locations for many decades, some for over a century. See Robison, *supra*, at 40 (Black Eagle Falls dam constructed by 1891). Until recently, these facilities were operated without title-based objection by the State of Montana. The State was well aware of the facilities' existence on the riverbeds— indeed, various Montana state agencies had participated in federal licensing proceedings for these hydroelectric projects. See, *e.g.*, *Montana Power Co.*, 8 F. P. C. 751, 752 (1949) (Thompson Falls project); *Montana Power Co.,* 27 FERC ¶62,097, pp. 63,188–63,189 (1984) (Ryan Dam of

Missouri-Madison project). Yet the State did not seek, and accordingly PPL and its predecessor did not pay, compensation for use of the riverbeds. 355 Mont., at 406, 229 P. 3d, at 427. Instead, the understanding of PPL and the United States is that PPL has been paying rents to the United States for use of those riverbeds, as well as for use of river uplands flooded by PPL's projects. Reply Brief for Petitioner 4; App. to Supp. Brief for Petitioner 4–5; Brief for United States as *Amicus Curiae* 3, n. 3.

In 2003, parents of Montana schoolchildren sued PPL in the United States District Court for the District of Montana, arguing that PPL had built its facilities on riverbeds that were state owned and part of Montana's school trust lands. 355 Mont., at 406, 229 P. 3d, at 426. Prompted by the litigation, the State joined the lawsuit, for the first time seeking rents for PPL's riverbed use. The case was dismissed in September 2005 for lack of diversity jurisdiction. *Dolan* v. *PPL Montana, LLC*, No. 9:03–cv–167 (D Mont., Sept. 27, 2005).

PPL and two other power companies sued the State of Montana in the First Judicial District Court of Montana, arguing that the State was barred from seeking compensation for use of the riverbeds. 355 Mont., at 407–408, 229 P. 3d, at 427–428. By counterclaim, the State sought a declaration that under the equal-footing doctrine it owns the riverbeds used by PPL and can charge rent for their use. *Id.,* at 408, 229 P. 3d, at 428. The Montana trial court granted summary judgment to Montana as to navigability for purposes of determining riverbed title. *Id.,* at 408–409, 413–414, 229 P. 3d, at 428, 431–432; App. to Pet. for Cert. 143. The court decided that the State owned the riverbeds. 355 Mont., at 428–429, 229 P. 3d, at 440. The court ordered PPL to pay $40,956,180 in rent for use of the riverbeds between 2000 and 2007. *Id.,* at 431–432, 229 P. 3d, at 442–443. Whether a lease for future periods would commence, and, if so, at what rental rate, seems to

have been left to the discretion of the Montana Board of Land Commissioners. App. to Pet. for Cert. 128–129.

In a decision by a divided court, the Montana Supreme Court affirmed. 355 Mont., at 461–462, 229 P. 3d, at 460–461; *id.,* at 462, 229 P. 3d, at 461 (dissenting opinion). The court reasoned from the background principle that "navigability for title purposes is very liberally construed." *Id.,* at 438, 229 P. 3d, at 446. It dismissed as having "limited applicability" this Court's approach of assessing the navigability of the disputed segment of the river rather than the river as a whole. *Id.,* at 441–442, 229 P. 3d, at 448–449. The Montana court accepted that certain relevant stretches of the rivers were not navigable but declared them "merely short interruptions" insufficient as a matter of law to find nonnavigability, since traffic had circumvented those stretches by overland portage. *Id.,* at 438, 442, 229 P. 3d, at 446, 449. Placing extensive reliance upon evidence of present-day use of the Madison River, the court found that river navigable as a matter of law at the time of statehood. *Id.,* at 439, 229 P. 3d, at 447.

Justice Rice dissented. *Id.,* at 462, 229 P. 3d, at 461. He stated that "courts are not to assume an *entire river* is navigable merely because certain reaches of the river are navigable." *Id.,* at 464, 229 P. 3d, at 462. The majority erred, he wrote, in rejecting the "section-by-section approach" and "declaring, as a matter of law, that the reaches claimed by PPL to be non-navigable are simply too 'short' to matter," when in fact PPL's evidence showed the "disputed reaches of the rivers were, at the time of statehood, non-navigable." *Id.,* at 463–466, 476–477, 229 P. 3d, at 462–464, 470.

This Court granted certiorari, 564 U. S. ___ (2011), and now reverses the judgment.

## III

## A

PPL contends the opinion of the Montana Supreme Court is flawed in three respects: first, the court's failure to consider with care the navigability of the particular river segments to which title is disputed, and its disregard of the necessary overland portage around some of those segments; second, its misplaced reliance upon evidence of present-day, recreational use; and third, what the state court itself called its liberal construction of the navigability test, which did not place the burden of proof upon the State to show navigability. Brief for Petitioner 26. The United States as *amicus* is in substantial agreement with PPL's arguments, although it offers a more extended discussion with respect to evidence of present-day, recreational use. Brief for United States 27–33.

It is appropriate to begin the analysis by discussing the legal principles that control the case.

## B

The rule that the States, in their capacity as sovereigns, hold title to the beds under navigable waters has origins in English common law. See *Shively* v. *Bowlby,* 152 U. S. 1, 13 (1894). A distinction was made in England between waters subject to the ebb and flow of the tide (royal rivers) and nontidal waters (public highways). With respect to royal rivers, the Crown was presumed to hold title to the riverbed and soil, but the public retained the right of passage and the right to fish in the stream. With respect to public highways, as the name suggests, the public also retained the right of water passage; but title to the riverbed and soil, as a general matter, was held in private ownership. Riparian landowners shared title, with each owning from his side to the center thread of the stream, as well as the exclusive right to fish there. See *Idaho* v. *Coeur d'Alene Tribe of Idaho*, 521 U. S. 261, 285 (1997)

(summarizing J. Angell, A Treatise on the Common Law in Relation to Water-Courses 14–18 (1824)); 3 J. Kent, Commentaries on American Law 528–529 (9th ed. 1858).

While the tide-based distinction for bed title was the initial rule in the 13 Colonies, after the Revolution American law moved to a different standard. Some state courts came early to the conclusion that a State holds presumptive title to navigable waters whether or not the waters are subject to the ebb and flow of the tide. See, *e.g., Carson* v. *Blazer*, 2 Binn. 475 (Pa. 1810); *Executors of Cates* v. *Wadlington*, 12 S. C. L. 580 (1822); *Wilson* v. *Forbes*, 13 N. C. 30 (1828); *Bullock* v. *Wilson*, 2 Port. 436 (Ala. 1835); *Elder* v. *Burrus*, 25 Tenn. 358 (1845). The tidal rule of "navigability" for sovereign ownership of riverbeds, while perhaps appropriate for England's dominant coastal geography, was ill suited to the United States with its vast number of major inland rivers upon which navigation could be sustained. See L. Houck, Law of Navigable Rivers 26–27, 31–35 (1868); *Packer* v. *Bird*, 137 U. S. 661, 667–669 (1891). By the late 19th century, the Court had recognized "the now prevailing doctrine" of state sovereign "title in the soil of rivers really navigable." *Shively, supra,* at 31; see *Barney* v. *Keokuk*, 94 U. S. 324, 336 (1877) ("In this country, as a general thing, all waters are deemed navigable which are really so"). This title rule became known as "navigability in fact."

The rule for state riverbed title assumed federal constitutional significance under the equal-footing doctrine. In 1842, the Court declared that for the 13 original States, the people of each State, based on principles of sovereignty, "hold the absolute right to all their navigable waters and the soils under them," subject only to rights surrendered and powers granted by the Constitution to the Federal Government. *Martin* v. *Lessee of Waddell*, 16 Pet. 367, 410 (1842). In a series of 19th-century cases, the Court determined that the same principle applied to

States later admitted to the Union, because the States in the Union are coequal sovereigns under the Constitution. See, *e.g.*, *Lessee of Pollard* v. *Hagan*, 3 How. 212, 228–229 (1845); *Knight* v. *United States Land Assn.*, 142 U. S. 161, 183 (1891); *Shively, supra,* at 26–31; see *United States* v. *Texas*, 339 U. S. 707, 716 (1950). These precedents are the basis for the equal-footing doctrine, under which a State's title to these lands was "conferred not by Congress but by the Constitution itself." *Oregon ex rel. State Land Bd.* v. *Corvallis Sand & Gravel Co.*, 429 U. S. 363, 374 (1977). It follows that any ensuing questions of navigability for determining state riverbed title are governed by federal law. See, *e.g., United States* v. *Utah*, 283 U. S. 64, 75 (1931); *United States* v. *Oregon*, 295 U. S. 1, 14 (1935).

The title consequences of the equal-footing doctrine can be stated in summary form: Upon statehood, the State gains title within its borders to the beds of waters then navigable (or tidally influenced, see *Phillips Petroleum Co.* v. *Mississippi*, 484 U. S. 469 (1988), although that is not relevant in this case). It may allocate and govern those lands according to state law subject only to "the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce." *Oregon*, *supra,* at 14; see *Montana* v. *United States*, 450 U. S. 544, 551 (1981); *United States* v. *Holt State Bank*, 270 U. S. 49, 54 (1926). The United States retains any title vested in it before statehood to any land beneath waters not then navigable (and not tidally influenced), to be transferred or licensed if and as it chooses. See *Utah*, *supra*, at 75; *Oregon*, *supra,* at 14.

Returning to the "navigability in fact" rule, the Court has explained the elements of this test. A basic formulation of the rule was set forth in *The Daniel Ball*, 10 Wall. 557 (1871), a case concerning federal power to regulate navigation:

"Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *Id.,* at 563.

The *Daniel Ball* formulation has been invoked in considering the navigability of waters for purposes of assessing federal regulatory authority under the Constitution, and the application of specific federal statutes, as to the waters and their beds. See, *e.g., ibid.; The Montello*, 20 Wall. 430, 439 (1874); *United States* v. *Appalachian Elec. Power Co.*, 311 U. S. 377, 406, and n. 21 (1940) (Federal Power Act); *Rapanos* v. *United States*, 547 U. S. 715, 730–731 (2006) (plurality opinion) (Clean Water Act); *id.,* at 761 (KENNEDY, J., concurring in judgment) (same). It has been used as well to determine questions of title to water beds under the equal-footing doctrine. See *Utah*, *supra,* at 76; *Oklahoma* v. *Texas*, 258 U. S. 574, 586 (1922); *Holt State Bank*, *supra,* at 56. It should be noted, however, that the test for navigability is not applied in the same way in these distinct types of cases.

Among the differences in application are the following. For state title under the equal-footing doctrine, navigability is determined at the time of statehood, see *Utah*, *supra,* at 75, and based on the "natural and ordinary condition" of the water, see *Oklahoma*, *supra,* at 591. In contrast, admiralty jurisdiction extends to water routes made navigable even if not formerly so, see, *e.g., Ex parte Boyer*, 109 U. S. 629, 631–632 (1884) (artificial canal); and federal regulatory authority encompasses waters that only recently have become navigable, see, *e.g., Philadelphia Co.* v. *Stimson*, 223 U. S. 605, 634–635 (1912), were once navigable but are no longer, see *Economy Light & Power*

*Co.* v. *United States*, 256 U. S. 113, 123–124 (1921), or are not navigable and never have been but may become so by reasonable improvements, see *Appalachian Elec. Power Co.*, *supra,* at 407–408. With respect to the federal commerce power, the inquiry regarding navigation historically focused on interstate commerce. See *The Daniel Ball*, *supra,* at 564. And, of course, the commerce power extends beyond navigation. See *Kaiser Aetna* v. *United States*, 444 U. S. 164, 173–174 (1979). In contrast, for title purposes, the inquiry depends only on navigation and not on interstate travel. See *Utah*, *supra,* at 76. This list of differences is not exhaustive. Indeed, "[e]ach application of [the *Daniel Ball*] test . . . is apt to uncover variations and refinements which require further elaboration." *Appalachian Elec. Power Co.*, *supra,* at 406.

## IV

### A

The primary flaw in the reasoning of the Montana Supreme Court lies in its treatment of the question of river segments and overland portage.

To determine title to a riverbed under the equal-footing doctrine, this Court considers the river on a segment-by-segment basis to assess whether the segment of the river, under which the riverbed in dispute lies, is navigable or not. In *United States* v. *Utah*, for example, the Court noted,

> "the controversy relates only to the sections of the rivers which are described in the complaint, and the Master has limited his findings and conclusions as to navigability accordingly. The propriety of this course, in view of the physical characteristics of the streams, is apparent. Even where the navigability of a river, speaking generally, is a matter of common knowledge, and hence one of which judicial notice may be taken, it may yet be a question, to be determined upon evi-

dence, how far navigability extends." 283 U. S., at 77.

The Court went on to conclude, after reciting and assessing the evidence, that the Colorado River was navigable for its first roughly 4-mile stretch, nonnavigable for the next roughly 36-mile stretch, and navigable for its remaining 149 miles. *Id.,* at 73–74, 79–81, 89. The Court noted the importance of determining "the exact point at which navigability may be deemed to end." *Id.,* at 90.

Similarly, in *Brewer-Elliott Oil & Gas Co.* v. *United States*, 260 U. S. 77, 85 (1922), the Court examined the segment of the Arkansas River that ran along the Osage Indian Reservation, assessing whether the Arkansas River was "navigable in fact at the *locus in quo.*" The Court concluded that the United States originally, and the Osages as its grantees, unequivocally held title to the riverbeds because the Arkansas River "is and was not navigable at the place where the river bed lots, here in controversy, are." *Id.,* at 86. The Court found the segment of river along the reservation to be nonnavigable even though a segment of the river that began further downstream was navigable. *Ibid.* See also *Oklahoma, supra,* at 583, 584, 587–588, 589–591 (noting that "how far up the streams navigability extended was not known"; assessing separately the segments of the Red River above and below its confluence with the Washita River within Oklahoma's borders; and concluding that neither segment, and hence "no part of the river within Oklahoma," was navigable).

The Montana Supreme Court discounted the segment-by-segment approach of this Court's cases, calling it "a piecemeal classification of navigability—with some stretches declared navigable, and others declared non-navigable." 355 Mont., at 440–442, 229 P. 3d, at 448–449. This was error. The segment-by-segment approach to navigability for title is well settled, and it should not be disregarded. A key justification for sovereign ownership of

navigable riverbeds is that a contrary rule would allow private riverbed owners to erect improvements on the riverbeds that could interfere with the public's right to use the waters as a highway for commerce. While the Federal Government and States retain regulatory power to protect public navigation, allocation to the State of the beds underlying navigable rivers reduces the possibility of conflict between private and public interests. See *Utah, supra,* at 82–83; *Packer,* 137 U. S., at 667. By contrast, segments that are nonnavigable at the time of statehood are those over which commerce could not then occur. Thus, there is no reason that these segments also should be deemed owned by the State under the equal-footing doctrine.

Practical considerations also support segmentation. Physical conditions that affect navigability often vary significantly over the length of a river. This is particularly true with longer rivers, which can traverse vastly different terrain and the flow of which can be affected by varying local climates. The Missouri River provides an excellent example: Between its headwaters and mouth, it runs for over 2,000 miles out of steep mountains, through canyons and upon rocky beds, over waterfalls and rapids, and across sandy plains, capturing runoff from snow melt and farmland rains alike. These shifts in physical conditions provide a means to determine appropriate start points and end points for the segment in question. Topographical and geographical indicators may assist. See, *e.g., Utah, supra,* at 77–80 (gradient changes); *Oklahoma,* 258 U. S., at 589 (location of tributary providing additional flow).

A segment approach to riverbed title allocation under the equal-footing doctrine is consistent with the manner in which private parties seek to establish riverbed title. For centuries, where title to the riverbed was not in the sovereign, the common-law rule for allocating riverbed title among riparian landowners involved apportionment defined both by segment (each landowner owns bed and soil

along the length of his land adjacent) and thread (each landowner owns bed and soil to the center of the stream). See J. Angell, A Treatise on the Law of Watercourses 18 (6th ed. 1869); *Tyler* v. *Wilkinson*, 24 F. Cas. 472, 474 (No. 14,312) (CC RI 1827) (Story, J.).  Montana, moreover, cannot suggest that segmentation is inadministrable when the state courts managed to divide up and apportion the underlying riverbeds for purposes of determining their value and the corresponding rents owed by PPL.

The Montana Supreme Court, relying upon *Utah*, decided that the segment-by-segment approach is inapplicable here because it "does not apply to 'short interruption[s] of navigability in a stream otherwise navigable.'"  355 Mont., at 442, 229 P. 3d, at 449 (quoting *Utah*, 283 U. S., at 77). This was mistaken.  In *Utah*, this Court noted in passing that the facts of the case concerned "long reaches with particular characteristics of navigability or non-navigability" rather than "short interruption[s]."  *Id.,* at 77.  The Court in *Utah* did not say the case would have a different outcome if a "short interruption" were concerned. *Ibid.*

Even if the law might find some nonnavigable segments so minimal that they merit treatment as part of a longer, navigable reach for purposes of title under the equal-footing doctrine, it is doubtful that any of the segments in this case would meet that standard, and one—the Great Falls reach—certainly would not.  As an initial matter, the kinds of considerations that would define a *de minimis* exception to the segment-by-segment approach would be those related to principles of ownership and title, such as inadministrability of parcels of exceedingly small size, or worthlessness of the parcels due to overdivision.  See Heller, The Tragedy of the Anticommons, 111 Harv. L. Rev. 621, 682–684 (1998) (explaining that dividing property into square-inch parcels, could, absent countervailing legal mechanisms, "paralyze the alienability of scarce

resources . . . or diminish their value too drastically"). An analysis of segmentation must be sensibly applied. A comparison of the nonnavigable segment's length to the overall length of the stream, for instance, would be simply irrelevant to the issue at hand.

A number of the segments at issue here are both discrete, as defined by physical features characteristic of navigability or nonnavigability, and substantial, as a matter of administrability for title purposes. This is best illustrated by the Great Falls reach, which is 17 miles long and has distinct drops including five waterfalls and continuous rapids in between. There is plenty of reason to doubt that reach's navigability based on the presence of the series of falls. There is also reason to think that title to that segment of bed would not be worthless or inadministrable. Indeed, the State sought and was awarded rent in the amount of $41 million for PPL's various hydroelectric facilities attached to the riverbeds, half of which are along the Great Falls reach.

Applying its "short interruptions" approach, the Montana Supreme Court decided that the Great Falls reach was navigable because it could be managed by way of land route portage. 355 Mont., at 440, 442, 229 P. 3d, at 447, 449. The court noted in particular the portage of Lewis and Clark's expedition. *Ibid.* Yet that very portage reveals the problem with the Montana Supreme Court's analysis. Leaving behind their larger boats, Lewis and Clark transported their supplies and some small canoes about 18 miles over land, which took at least 11 days and probably more. See Lewis and Clark Journals 126–152; 9 Journals of the Lewis & Clark Expedition 173; Dear Brother 109. Even if portage were to take travelers only one day, its significance is the same: it demonstrates the need to bypass the river segment, all because that part of the river is nonnavigable. Thus, the Montana Supreme Court was wrong to state, with respect to the Great Falls

reach and other stretches of the rivers in question, that portages "are not sufficient to defeat a finding of navigability." 355 Mont., at 438, 229 P. 3d, at 446. In most cases, they are, because they require transportation over land rather than over the water. This is such a case, at least as to the Great Falls reach.

In reaching its conclusion that the necessity of portage does not undermine navigability, the Montana Supreme Court misapplied this Court's decision in *The Montello*, 20 Wall. 430. See 355 Mont., at 438, 229 P. 3d, at 446. The consideration of portage in *The Montello* was for a different purpose. The Court did not seek to determine whether the river in question was navigable for title purposes but instead whether it was navigable for purposes of determining whether boats upon it could be regulated by the Federal Government. 20 Wall., at 439, 445. The primary focus in *The Montello* was not upon navigability in fact but upon whether the river was a "navigable water of the United States." *Id.,* at 439, 443. The latter inquiry is doctrinally distinct. It turns upon whether the river "forms by itself, or by its connection with other waters, a continued highway over which commerce is, or may be, carried with other States or foreign countries in the customary modes in which such commerce is conducted by water." *Id.,* at 439 (citing *The Daniel Ball*, 10 Wall. 557). It is language similar to "continued highway" that Montana urges the Court to import into the title context in lieu of the Court's established segmentation approach. Brief for Respondent 42–43, n. 16.

*The Montello* reasonably concluded that the portages required in that case did not prevent the river from being part of a channel of interstate commerce. Portages continued that channel because goods could be successfully transported interstate, in part upon the waters in question. This provided sufficient basis to regulate steamboats at places where those boats could and did, in fact, navigate

portions of the river. 20 Wall., at 445. Here, by contrast, the question regards ownership of the bed under river segments that the Montana Supreme Court, by calling them "interruptions in the navigation," 355 Mont., at 442, 229 P. 3d, at 449, acknowledges were nonnavigable. The reasoning and the inquiry of *The Montello* does not control the outcome where the quite different concerns of the riverbed title context apply.

Having clarified that portages may defeat navigability for title purposes, and do so with respect to the Great Falls reach, the Court sees no evidence in the record that could demonstrate that the Great Falls reach was navigable. Montana does not dispute that overland portage was necessary to traverse that reach. Indeed, the State admits "the falls themselves were not passable by boat at statehood." Brief for Respondent 10. And the trial court noted the falls had never been navigated. App. to Pet. for Cert. 137. Based on these statements, this Court now concludes, contrary to the Montana Supreme Court's decision, that the 17-mile Great Falls reach, at least from the head of the first waterfall to the foot of the last, is not navigable for purposes of riverbed title under the equal-footing doctrine.

This Court also determines, based on evidence in the record, that there is a significant likelihood that some of the other river stretches in dispute also fail the federal test of navigability for the purpose of determining title. For example, as to the disputed segment of the Clark Fork River, the Montana Supreme Court incorrectly stated the sole evidence for nonnavigability "consists of conclusory statements . . . without any specific factual support." 355 Mont., at 440, 229 P. 3d, at 448. In fact, PPL introduced a report of the U. S. Army Corps of Engineers from 1891, two years after Montana's date of statehood, documenting that the portion of the Clark Fork river between Missoula and Lake Pend Oreille (which includes the location of

PPL's Thompson Falls facility) had a fall of about 1,100 feet in 250 miles and "is a mountain torrential stream, full of rocks, rapids, and falls, . . . utterly unnavigable, and incapable of being made navigable except at an enormous cost." 2 H. R. Exec. Doc., pt. 5, at 3250; see App. 379–380 (Docket No. 169). The report based its conclusions on various failed attempts to navigate the river. It found the Thompson Falls "a complete obstruction to navigation" and the river around that area "exceedingly rapid, rough, and full of rocks." 2 H. R. Exec. Doc., pt. 5, at 3251. This was consistent with a 1910 Federal District Court decree. The decree adjudicated a title dispute between two private parties over the riverbed near and under Thompson Falls and declared the river at that place "was and is a nonnavigable stream incapable of carrying the products of the country in the usual manner of water transportation." *Steele* v. *Donlan*, Equity No. 950 (CC D Mont., July 19, 1910), p. 1; see App. 380–381 (Docket No. 169). While the ultimate decision as to this and the other disputed river stretches is to be determined, in the first instance, by the Montana courts upon remand, the relevant evidence should be assessed in light of the principles discussed in this opinion.

B

The Montana Supreme Court further erred as a matter of law in its reliance upon the evidence of present-day, primarily recreational use of the Madison River. Error is not inherent in a court's consideration of such evidence, but the evidence must be confined to that which shows the river could sustain the kinds of commercial use that, as a realistic matter, might have occurred at the time of statehood. Navigability must be assessed as of the time of statehood, and it concerns the river's usefulness for "'trade and travel,'" rather than for other purposes. See *Utah*, 283 U. S., at 75–76. Mere use by initial explorers or trap-

pers, who may have dragged their boats in or alongside the river despite its nonnavigability in order to avoid getting lost, or to provide water for their horses and themselves, is not itself enough. See *Oregon*, 295 U. S., at 20–21 (evidence that "trappers appear to have waded or walked" through the river, dragging their boats rather than floating them, had "no bearing on navigability").

True, river segments are navigable not only if they "[were] used," but also if they "[were] susceptible of being used," as highways of commerce at the time of statehood. *Utah*, *supra,* at 76 (internal quotation marks omitted). Evidence of recreational use, depending on its nature, may bear upon susceptibility of commercial use at the time of statehood. See *Appalachian Elec. Power Co.*, 311 U. S., at 416 ("[P]ersonal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation"); *Utah*, 283 U. S., at 82 (fact that actual use has "been more of a private nature than of a public, commercial sort . . . cannot be regarded as controlling"). Similarly, poststatehood evidence, depending on its nature, may show susceptibility of use at the time of statehood. See *id.,* at 82–83 ("[E]xtensive and continued [historical] use for commercial purposes" may be the "most persuasive" form of evidence, but the "crucial question" is the potential for such use at the time of statehood, rather than "the mere manner or extent of actual use").

Evidence of present-day use may be considered to the extent it informs the historical determination whether the river segment was susceptible of use for commercial navigation at the time of statehood. For the susceptibility analysis, it must be determined whether trade and travel could have been conducted "in the customary modes of trade and travel on water," over the relevant river segment "in [its] natural and ordinary condition." *Id.,* at 76 (internal quotation marks omitted). At a minimum, therefore, the party seeking to use present-day evidence for title

purposes must show: (1) the watercraft are meaningfully similar to those in customary use for trade and travel at the time of statehood; and (2) the river's poststatehood condition is not materially different from its physical condition at statehood. See also *Oregon, supra,* at 18 (finding that scientific and historical evidence showed that the physical condition of particular water bodies had not varied substantially since statehood in a way that might affect navigation). If modern watercraft permit navigability where the historical watercraft would not, or if the river has changed in ways that substantially improve its navigability, then the evidence of present-day use has little or no bearing on navigability at statehood.

The Montana Supreme Court opinion offered no indication that it made these necessary findings. The court concluded the evidence of present-day use of the Madison was probative of its susceptibility of use at statehood, but there is no apparent basis for its conclusion. 355 Mont., at 442–443, 438–439, 229 P. 3d, at 449, 446–447. The court did not find the watercraft similar to those used at the time of statehood, and the State's evidence of present-day use for recreational fishing did not indicate what types of boats are now used. App. 46–48. Modern recreational fishing boats, including inflatable rafts and lightweight canoes or kayaks, may be able to navigate waters much more shallow or with rockier beds than the boats customarily used for trade and travel at statehood.

As to the river's physical condition, the Montana Supreme Court did not assess with care PPL's evidence about changes to the river's flow and the location and pattern of its channel since statehood. The affidavit of PPL's expert in fluvial geomorphology—the study of river-related landforms—at least suggests that as a result of PPL's dams, the river has become "less torrential" in high flow periods and less shallow in low flow periods. App. 575–577 (Docket No. 170). Thus, the river may well be

easier to navigate now than at statehood.

The Montana Supreme Court altogether ignored the expert's reasoning about the past condition of the river's channels and the significance of that information for navigability. Further, contrary to the Montana Supreme Court's suggestion, the expert's affidavit was not mere evidence of change in "seasonal variations" of water depth. 355 Mont., at 440, 229 P. 3d, at 448. It provided meaningful evidence that the river's conditions had changed since statehood in ways that made present-day navigation of the river easier in all seasons than it was at the relevant time. While the Montana court was correct that a river need not be susceptible of navigation at every point during the year, neither can that susceptibility be so brief that it is not a commercial reality. Against this background, the present-day recreational use of the river did not bear on navigability for purposes of title under the equal-footing doctrine. The Montana Supreme Court's reliance upon the State's evidence of present-day, recreational use, at least without further inquiry, was wrong as a matter of law.

## C

The above analysis is sufficient to require reversal of the grant of summary judgment to Montana. Therefore, the Court declines to decide whether the Montana Supreme Court further erred as to the burden of proof regarding navigability.

## D

As a final contention, the State of Montana suggests that denying the State title to the riverbeds here in dispute will undermine the public trust doctrine, which concerns public access to the waters above those beds for purposes of navigation, fishing, and other recreational uses. Brief for Respondent 20, 24–26. This suggestion underscores the State's misapprehension of the equal

footing and public trust doctrines.

The public trust doctrine is of ancient origin. Its roots trace to Roman civil law and its principles can be found in the English common law on public navigation and fishing rights over tidal lands and in the state laws of this country. See *Coeur d'Alene*, 521 U. S., at 284–286; *Illinois Central R. Co.* v. *Illinois*, 146 U. S. 387, 458 (1892); D. Slade, Putting the Public Trust Doctrine to Work 3–8, 15–24 (1990); see, *e.g.*, *National Audubon Soc.* v. *Superior Court of Alpine Cty.*, 33 Cal. 3d 419, 433–441, 658 P. 2d 709, 718–724 (1983); *Arnold* v. *Mundy*, 6 N. J. L. 1, 9–10 (1821). Unlike the equal-footing doctrine, however, which is the constitutional foundation for the navigability rule of riverbed title, the public trust doctrine remains a matter of state law, see *Coeur d'Alene*, *supra,* at 285 (*Illinois Central*, a Supreme Court public trust case, was "'necessarily a statement of Illinois law'"); *Appleby* v. *City of New York*, 271 U. S. 364, 395 (1926) (same), subject as well to the federal power to regulate vessels and navigation under the Commerce Clause and admiralty power. While equal-footing cases have noted that the State takes title to the navigable waters and their beds in trust for the public, see *Shively*, 152 U. S., at 49, 15–17, 24, 46, the contours of that public trust do not depend upon the Constitution. Under accepted principles of federalism, the States retain residual power to determine the scope of the public trust over waters within their borders, while federal law determines riverbed title under the equal-footing doctrine.

## V

As the litigation history of this case shows, Montana filed its claim for riverbed rent over a century after the first of the dams was built upon the riverbeds. Montana had not sought compensation before then, despite its full awareness of PPL's hydroelectric projects and despite the State's own participation in the projects' federal licensing

process. While this Court does not reach the question, it may be that by virtue of the State's sovereignty, neither laches nor estoppel could apply in a strict sense to bar the State's much belated claim. Still, the reliance by PPL and its predecessors in title upon the State's long failure to assert title is some evidence to support the conclusion that the river segments were nonnavigable for purposes of the equal-footing doctrine.

The Montana Supreme Court's ruling that Montana owns and may charge for use of riverbeds across the State was based upon an infirm legal understanding of this Court's rules of navigability for title under the equal-footing doctrine. As the Court said in *Brewer-Elliott*, "It is not for a State by courts or legislature, in dealing with the general subject of beds or streams, to adopt a retroactive rule for determining navigability which . . . would enlarge what actually passed to the State, at the time of her admission, under the constitutional rule of equality here invoked." 260 U. S., at 88.

\* \* \*

The judgment of the Montana Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*