Affirmed by published opinion. Judge Niemeyer wrote the majority opinion, in which Judge Agee joined. Judge King wrote a dissenting opinion.
NIEMEYER, Circuit Judge:
The State of North Carolina commenced this action against Alcoa Power Generating, Inc., seeking a declaratory judgment that North Carolina owns a 45-mile segment of the riverbed of the Yadkin River in North Carolina that, over the past 100 years, Alcoa purportedly acquired by deed and developed, with the construction of four hydroelectric dams to supply electrical power to its aluminum smelting plant in Badin, North Carolina.[1]
In its complaint, North Carolina alleged that, at the time it attained statehood in 1789, the 45-mile segment of the Yadkin River was navigable and therefore that North Carolina had always “owned and continue[d] to own the submerged bed of the Relevant Segment of the Yadkin River *144 in its entirety and [to] hold title to that submerged land in trust for the people of the State.” It alleged further that Alcoa had been using the segment only with North Carolina’s permission and that, when Alcoa announced in April 2010 that it was permanently shutting down its smelting plant and laying off its employees there, conditions changed so as to prompt North Carolina to withdraw its permission.
The district court, in an opinion making findings of fact and conclusions of law following a bench trial, found that the relevant segment of the Yadkin River was not navigable at North Carolina’s statehood so as to give it title to the riverbed as an aspect of sovereignty. The court also ruled as a matter of law that Alcoa successfully proved its title to 99% of the relevant segment under North Carolina’s Marketable Title Act and to the remaining 1% under the doctrine of adverse possession.
On North Carolina’s appeal, we affirm, concluding that the district court did not clearly err in its factual finding that the Yadkin River was not navigable at statehood and did not err in concluding, as a matter of law, that Alcoa has good title to the riverbed.
I
The Yadkin River rises in the northwestern part of North Carolina near the town of Blowing Rock and, for a stretch, flows eastward before flowing southward across the center part of the State to the North Carolina-South Carolina border, where it is known as the Pee Dee River. The dispute in this case involves a 45-mile segment of the river running through Rowan, Davie, Davidson, Stanly, and Montgomery Counties, which Alcoa purportedly acquired by deed and developed.
In 1915, Alcoa constructed its smelting plant in Badin and concurrently began acquiring riverbed land and constructing hydroelectric dams to supply the plant with electric power. It constructed one dam in 1917 in the area of the river known as the Narrows; another in 1919 in an area known as the Falls; and a third in 1927 near High Rock. When it sought to build a fourth dam in 1987 in Tuckertown, it filed a declaration of its intent to do so with the Federal Power Commission (“FPC”) but stated in its declaration its belief that the federal government lacked regulatory jurisdiction because the stretch of the Yad-kin River on which the dam was to be constructed was not navigable. North Carolina agreed with Alcoa’s position, stating to the FPC that the segment of the river “at the Tuckertown project and below is not now and has not been a navigable stream.” The State also represented to the FPC that Alcoa had acquired its riverbed rights “in every respect in accordance with” state law.
Some 20 years later, in 1956, when Alcoa applied to the FPC for a 50-year license for its dams, it again stated its belief that the FPC did not have jurisdiction. Alcoa acknowledged, however, that because the FPC had taken the position that the interests of interstate commerce and foreign commerce would be affected by Alcoa’s activities, it was applying for a 50-year license. Again, North Carolina supported Alcoa’s application and adopted Alcoa’s evidence, which included the deeds by which Alcoa had acquired the riverbed. The FPC granted Alcoa the 50-year license, as requested.
In 2006, when the FPC license expired and Alcoa applied for a renewal, North Carolina again received notice of Alcoa’s claim of ownership of the riverbed and again did not object to Alcoa’s claim.
For decades, Alcoa has paid property taxes on the riverbed parcels it acquired and posted signs on its property prohibit *145 ing trespassing. Alcoa has also granted North Carolina permits and licenses to enter its property.
In 2007, Alcoa decided to cease its aluminum smelting operations at Badin, and it ultimately closed that plant in 2010, laying off the plant’s employees. Nonetheless, it continued to seek and obtain renewals of its licenses for the operation of its hydroelectric dams, enabling it to sell at wholesale the electricity produced by those dams.
In response to Alcoa’s closure of the smelting plant, North Carolina commenced this action in 2013 in the Wake County Superior Court. It sought a declaratory judgment that the riverbed of the relevant segment of the Yadkin River was “the sole and exclusive property of the State.” It claimed that Alcoa had been using North Carolina’s property with its permission and that the closure of the Badin plant “so fundamentally changed the basis” of its relationship with Alcoa that North Carolina now wished to withdraw that permission. To support its claim of ownership, North Carolina alleged that the relevant segment of the Yadkin had always been and continued to be navigable in fact and that, as a consequence of the segment’s navigability, it owned and had owned since statehood not only the riverbed of the relevant segment but also the entire river, as an incident of sovereignty.
Alcoa removed the case to the district court pursuant to 28 U.S.C. § 1441(a), contending that the issue of navigability for title was a question of federal law arising under the U.S. Constitution. North Carolina disagreed, however, and filed a motion to remand the case to state court, asserting that its complaint did not state a claim arising under federal law. The district court agreed with Alcoa’s invocation of federal jurisdiction and denied North Carolina’s motion to remand.
The parties filed cross-motions for summary judgment, which the district court denied, concluding that the question of navigability, which was central to the resolution of other issues, could not be resolved without a trial. At a bench trial on this issue, North Carolina presented one witness — Professor Larry Tise, an expert in history — and Alcoa presented four witnesses, three of whom were expert witnesses — Dr. Michael Harvey, a fluvial geo-morphologist; Dr. Mark Newell, an expert marine archeologist; and Dr. Dan Morrill, a historian. Alcoa’s fourth witness was Ray Barham, an Alcoa manager who testified as to Alcoa’s claim of ownership of the riverbed beneath the relevant segment and its activities there.
At the conclusion of the trial, the district court found that North Carolina had not carried its burden of proving that the contested segment of the Yadkin River had been navigable at statehood. The court concluded first that the geography of the relevant segment was characterized by “steep slopes, narrow valleys, rapids, falls, ledges, and exposed rock.” It found also that pole boats and flats, the primary means of commercial navigation in 1789, “would have had difficulty navigating shallow, steep, swift-moving, rocky rivers.” Finally, it concluded that while the historical record from the relevant area was somewhat sparse, it nonetheless revealed a lack of commercial navigation at statehood and repeated efforts thereafter directed at making the relevant segment navigable.
Based on its findings of facts relevant to navigability of the relevant segment, the court then applied the legal standard for determining navigability, as set forth in PPL Montana, LLC v. Montana, 565 U.S. 576, 132 S.Ct. 1215, 182 L.Ed.2d 77 (2012), concluding that the 45-mile segment had not been navigable at statehood. In particular, the court recognized PPL Montana’s *146 requirement to consider the navigability of a river on a segment-by-segment basis and to treat portages within segments as defeating a finding of navigability.
Following the bench trial, the district court addressed Alcoa’s undisputed evidence supporting its title to the segment’s riverbed on its second motion for summary judgment and concluded, as a matter of law, that Alcoa had title to 99% of the contested riverbed under North Carolina’s Marketable Title Act and title to the remaining 1% by reason of adverse possession.
From the district court’s final judgment dated September 28, 2015, North Carolina filed this appeal challenging (1) the district court’s subject matter jurisdiction; (2) its finding of navigability; and (3) its application of the Marketable Title Act and the doctrine of adverse possession.
II
North Carolina contends first that the district court lacked subject matter jurisdiction over the complaint and therefore should have remanded this case to state court, where the complaint had initially been filed. It argues that its complaint alleged a garden variety state law claim to quiet title under the North Carolina Declaratory Judgment Act and that therefore, under the well-pleaded complaint doctrine, its election to pursue a state law claim in state court should have been honored. See Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987) (noting that the plaintiff, as “master of the claim,” may avoid federal jurisdiction by alleging a claim under state law); Am. Well Works Co. v. Layne & Bowler Co., 241 U.S. 257, 260, 36 S.Ct. 585, 60 L.Ed. 987 (1916) (noting that generally a suit “arises under the law that creates the cause of action”). As it asserts, “the State did not allege or seek a judgment that its ownership of the riverbed was dependent upon federal law in any way.”
While North Carolina’s characterization of its complaint may be accurate as far as it goes, such a characterization will not always resolve whether federal jurisdiction exists. Regardless of the allegations of a state law claim, “where the vindication of a right under state law necessarily turn[s] on some construction of federal law,” the claim arises under federal law and thus supports federal question jurisdiction under 28 U.S.C. § 1331. Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal., 463 U.S. 1, 9, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). The more relevant question, therefore, is whether the right that North Carolina seeks to vindicate — the right to title of riverbed land as determined by the river’s navigability vel non at statehood — turns on construction of federal law. The district court concluded that it did, relying on the Supreme Court’s statement in PPL Montana that “questions of navigability for determining state riverbed title are governed by federal law.” 132 S.Ct. at 1227.
Although North Carolina acknowledges the navigability principle announced in PPL Montana, it nonetheless argues that the principle is not applicable to the original 13 States because PPL Montana based its finding of federal jurisdiction on the Equal Footing Doctrine, which applies only to the 37 later-admitted States so as to make them coequal to the original 13.[2] *147 It maintains that because it was one of the original 13 States, the law governing navigability for title must be state law. Thus, it contends, “PPL, an equal footing case, has no bearing on the riverbed title of an original State. PPL’s language that ‘questions of navigability for determining state riverbed title are governed by federal law,’ 132 S.Ct. at 1227, applies solely to the ‘new equal footing States,” i.e., the remaining 37.
In making this argument, however, North Carolina leaves out important steps in the historical analysis and misconstrues the scope of the Supreme Court’s holding in PPL Montana that questions of navigability for determining riverbed title are governed by federal law.
The Supreme Court long ago recognized that the title to a State’s navigable waters and their riverbeds vested in the State as an aspect of sovereignty obtained when separating from the British Crown and becoming a State. See Martin v. Waddell’s Lessee, 41 U.S. (16 Pet.) 367, 410, 10 L.Ed. 997 (1842). In Waddell’s Lessee, one party claimed title to oyster beds in the navigable waters of the Raritan River and Bay in New Jersey, tracing its title to a pre-statehood grant from the British Crown, and the other party asserted ownership by reason of a post-statehood New Jersey law. Because each party was thus able to trace ownership — one to the Crown and the other to the State of New Jersey — the dispute required the Supreme Court to analyze the nature of state sovereignty under the Constitution. The Court held that “when the revolution took place, the people of each state became themselves sovereign” and that the rights that flowed from that sovereignty upon the subsequent ratification of the Constitution meant that States “hold the absolute right to all their navigable waters, and the soils under them, for their own common use, subject only to the rights since surrendered by the constitution to the general government.” Id. The Court subsequently reiterated this constitutional basis for a State’s title to beds of navigable waters, stating that a “State receives absolute title to the beds of navigable waterways within its boundaries upon admission to the Union” and that its absolute title to the beds of navigable waters “is conferred not by Congress but by the Constitution itself.” Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co., 429 U.S. 363, 372, 374, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977) (emphasis added).
This constitutional insight — that with the formation of the Nation, the States gained title to all of the navigable waterways within their borders — was later expanded to new States as they joined the Union. In cases like Pollard’s Lessee v. Hagan, 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845), Knight v. United Land Association, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974 (1891), and Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894), the Supreme Court recognized that later-admitted States were co-equal sovereigns under the Constitution and accordingly applied the Equal Footing Doctrine.
Thus, it was the constitutional nature of state ownership of navigable waters that led the Court to determine that navigability for title was governed by federal law and was thus an appropriate basis for federal question jurisdiction. This basis for *148 federal question jurisdiction was explicitly-invoked in United States v. Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 (1931), where the Court explained, in resolving a property dispute between the United States and Utah, that, because Utah’s claim of ownership relied on the navigability of a segment of the Colorado River at statehood, the “question of navigability [was] thus determinative of the controversy, and that is a federal question.” Id. at 75, 51 S.Ct. 438. The Court then applied the federal standard of navigability, which was set out in The Daniel Ball, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870) (articulating the criteria for navigability).
Thus, when the PPL Montana Court stated that “questions of navigability for determining state riverbed title are governed by federal law,” it was only reaffirming the federal nature of the issue of navigability for title, a nature evident since the founding and recognized in cases over the course of more than 150 years. 132 S.Ct. at 1227.
In response to our holding on federal jurisdiction, the opinion of our good colleague in dissent dismisses as irrelevant Waddell Lessee’s treatment of navigability for title as a federal question — based on the nature of state sovereignty under the Constitution — by focusing only on North Carolina’s pre-Constitution sovereignty at the time of the Revolution in 1776. Although Waddell’s Lessee noted that original States such as New Jersey did obtain sovereignty upon their separation from England in 1776, the Court nonetheless relied on the post-Constitution sovereignty of a State in treating navigability for title as a federal question. Accordingly, even though North Carolina did enjoy sovereignty before its ratification of the Constitution, the nature of its sovereignty emanating from ratification formed the basis for federal jurisdiction. This is the reading that the Supreme Court has repeatedly given Waddell’s Lessee in subsequent Supreme Court decisions. See PPL Montana, 132 S.Ct. at 1227 (explaining Waddell’s Lessee to hold that “for the 13 original States, the people in each State, based on principles of sovereignty, hold the absolute right to all their navigable waters and soils under them” (emphasis added, internal quotation marks omitted)); Corvallis Sand & Gravel, 429 U.S. at 378, 97 S.Ct. 582 (explaining that under Waddell’s Lessee and Pollard’s Lessee, “the State’s title to lands underlying navigable waters within its boundaries is conferred ... by the Constitution itself’); United States v. Utah, 283 U.S. at 75-76, 51 S.Ct. 438 (noting that the substantive “question of navigability is ... a federal question,” after which it applied the standard for navigability from The Daniel Ball); Pollard’s Lessee, 44 U.S. (3 How.) at 230 (reiterating the law of Waddell’s Lessee and concluding that the “right of eminent domain over the shores and soils under the navigable waters ... belongs exclusively to the states within their respective territorial jurisdictions, and they, and only they, have the Constitutional power to exercise it” (emphasis added)). Accordingly, the dissenting opinion’s discussion of North Carolina’s pre-Consti-tution sovereignty simply avoids the relevant question.
In urging that the Equal Footing Doctrine could be the only basis for federal jurisdiction over this case, North Carolina argues, as does the dissenting opinion, that PPL Montana’s invocation of the Equal Footing Doctrine for federal jurisdiction creates a basis of federal jurisdiction applicable only to the later-admitted 37 States, leaving the remaining 13 States without federal jurisdiction for the same type of case. This argument, however, not only misunderstands the federal basis for federal jurisdiction over the issue of navigability for title, it also posits an unacceptable *149 inequality among the States in its effort to avoid federal jurisdiction. Indeed, its position is irreconcilable with the tenets of the Equal Footing Doctrine itself, which was designed to ensure that the new States enter the Union with “the same rights, sovereignty, and jurisdiction ... as the original states.” Pollard’s Lessee, 44 U.S. (3 How.) at 230 (emphasis added). Application of the Equal Footing Doctrine was necessary to recognize that all of the States, both the original ones and the new ones, “are coequal sovereigns under the Constitution.” PPL Montana, 132 S.Ct. at 1227. In this manner, federal jurisdiction flows directly from the same original principle — ie., the constitutional nature of state ownership of navigable waters — that the Equal Footing Doctrine extends to the Nation’s later-admitted States.
The position advocated by North Carolina and the dissenting opinion would result in a bizarre state of affairs with two different classes of States under the Constitution. It posits that navigability for title presents a federal question in 37 States and a state question in the original 13 States, resulting in unequal footing among the States. Thus, for example, state courts in Georgia, one of the original 13 States, would apply state law to resolve the navigability for title issues for the Chattahoochee River, while federal courts in Florida, a later-admitted State, would apply federal law to rule on the navigability of the same river under the principles articulated in PPL Montana. Consequently, Georgia courts could hold that when a portion of the river is navigable, the entire river is navigable, as the State of Montana did in PPL Montana, rejecting any notion of segmentation for purposes of determining navigability and disregarding portages for unnavigable segments, whereas Florida would have to conclude, being governed by PPL Montana, that segmentation was necessary and that portages precluded a finding of navigability. Such an outcome would place the States on unequal footing and would, indeed, challenge the supremacy of federal law and the equal application of Supreme Court cases to the States.
The dissenting opinion, in addressing this unacceptable inequality, conflates its discussion of federal question jurisdiction over issues of navigability for title with the substantive question of who has title to particular riverbeds. This confusion obscures the serious problems that would result if the reasoning of the dissent were adopted as law. Thus, the opinion suggests that our ruling on jurisdiction is based on the notion that all 50 states must have the same law with respect to land titles. Post, at 160-61. At no point, however, do we propose or imply such an idea; the States self-evidently possess title to lands differently from each other. Instead, we reject the arguments advanced by North Carolina and by the dissenting opinion because they would lead to States having different jurisdiction over questions of title. Thus, in our hypothetical discussion of the Chattahoochee River, the bizarre state of affairs that we seek to avoid is not concerned with an inequality of land titles or with different States having different substantive property laws. Our hypothetical is instead intended to highlight that North Carolina’s position would lead to an inequality of jurisdiction between the courts of two States. Both North Carolina and the dissenting opinion advocate for a legal paradigm in which the courts of Georgia can hear questions of a sort forbidden to the courts of Florida, a truly strange proposition which bears little resemblance to any other aspect of American jurisprudence.
At bottom, we conclude that the district court did have subject matter jurisdiction over the issue of navigability for title under 28 U.S.C. § 1331 and therefore did not *150 err in denying North Carolina’s motion to remand to state court.
Ill
On the merits of whether the relevant segment of the Yadkin River was navigable for title, the district court found that it was not. The court considered whether the relevant segment was navigable at the time of North Carolina’s statehood in 1789, as required by PPL Montana. It found that the relevant segment — which the parties agreed was a 45-mile segment from river miles 233.1 to 279.7 — was characterized by “steep slopes, narrow valleys, rapids, falls, ledges, and exposed rock.” It also found that pole boats and flats, the primary means of commercial navigation at statehood, “would have had difficulty navigating shallow, steep, swift-moving, rocky rivers.” Finally, it observed that while the historical record from the relevant era was sparse, it nonetheless revealed both a lack of commercial navigation at statehood and repeated efforts after statehood in attempting to make the relevant segment navigable. Applying the standard of PPL Montana — that rivers are navigable “when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water,” 132 S.Ct. at 1228 (quoting The Daniel Ball, 77 U.S. (10 Wall.) at 563)— the district court concluded that the relevant segment was not navigable at statehood.
North Carolina challenges the manner in which the district court segmented the river and, in any event, contends that its findings of fact were clearly erroneous. We address each argument in turn.
A
On the issue of segmentation, North Carolina’s complaint described the entire contested stretch of river as the “Relevant Segment” and alleged that it was navigable in fact. North Carolina now claims that it did not intend its use of the term “Relevant Segment” to serve as a concession that the entire segment should be considered as a whole for purposes of determining navigability. But even as it now challenges whether the district court should have considered the relevant segment as a whole, it does not propose any alternative segmentation that might have been more appropriate.
In response, Alcoa claims that North Carolina waived its argument challenging treatment of the relevant segment as a whole because it failed to raise the issue in the district court. It notes that North Carolina never objected when Alcoa referred to the relevant segment as “a single continuous segment” and explained the question as being whether the segment was navigable in fact at statehood “from one end to the other.” Nor did North Carolina disagree at trial when Alcoa stated that the parties had stipulated that the contested area should be considered as one segment.
Consistent with Alcoa’s observations, the district court’s rulings indicate its understanding that North Carolina was not challenging the' consideration of the segment as a whole for purposes of resolving the navigability issue. In any event, on the merits of whether the district court erred in treating the entire segment as a single unit for purposes of determining navigability, we conclude that it did not.
In PPL Montana, the Supreme Court explained that navigability for title is determined “on a segment-by-segment basis to assess whether the segment of the river, under which the riverbed in dispute lies, is navigable or not.” 132 S.Ct. at 1229. In *151 explaining how an appropriate segment may be selected, the Court stated that a segment should be “both discrete, as defined by physical features characteristic of navigability or nonnavigability, and substantial, as a matter of administrability for title purposes.” Id. at 1231.
While the district court assumed that there was no dispute about the appropriate segment for consideration, it nonetheless had sufficient evidence before it to support its treatment of the entire segment as a single entity. One of the experts presented by Alcoa, Dr. Michael Harvey, a fluvial geomorphologist, specifically testified that the 45-mile contested area was a proper segment. In his report, he explained that the geology supports a division of the Yad-kin-Pee Dee River into four segments, one of which is the contested area. The Upper Yadkin, upstream of the contested area, is underlain by granitic and metaigneous rocks. The contested area, separated by a fall line from the Upper Yadkin, is characterized primarily by metavolcanic rocks, which are harder and more erosion resistant. The Upper Pee Dee River, immediately downstream from the contested area, contains igneous and metasedimentary rocks. The geology of the river is, therefore, a physical feature of navigability that supports the segmentation assumed by the district court.
The evidence also showed that the relevant segment was also appropriately substantial. Indeed, the fact that Alcoa has now spent decades controlling, developing, and administering the entire contested area as its own property and as a unit establishes that the segment is demonstrably administrable for title purposes.
In disagreeing with the district court’s conclusion that the 45-mile segment should be considered as a single segment under the standard set forth in PPL Montana, the dissenting opinion fails to address PPL Montana’s standard for segmentation and the facts in the record that support the district court’s finding that the segmentation was appropriate, particularly the testimony on this issue given by Dr. Harvey. Its consideration of these facts would make clear that the district court’s segmentation finding was supported by substantial evidence in the record.
In short, we conclude that the district court’s treatment of the 45-mile segment as a single segment was not in error, as the record evidence supports that finding.
B
As to the district court’s finding that the relevant segment was in fact not navigable at statehood, North Carolina argues that the district court’s findings , of fact were clearly erroneous.
When reviewing for clear error, we reverse only when we possess a “definite and firm conviction that a mistake has been committed.” United States v. Hall, 664 F.3d 456, 462 (4th Cir. 2012) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). Moreover, we “should be especially reluctant to set aside a finding based on the trial court’s evaluation of conflicting expert testimony,” as was the case here. Id. (quoting Hendricks v. Cent. Reserve Life Ins. Co., 39 F.3d 507, 513 (4th Cir. 1994)).
When used for title purposes, navigability is determined at the time of statehood based on the natural and ordinary condition of the body of water. PPL Montana, 132 S.Ct. at 1228. Thus, courts seeking to determine navigability for title must determine whether, at statehood, the relevant segment of the river could have been used as a highway for commerce, by the “customary modes of trade and travel” available at that time. Id. at 1233. The *152 PPL Montana Court explained that portages are generally sufficient to defeat a finding of navigability because they require transportation over land rather than over water. Id. at 1231.
Alcoa presented three expert witnesses who testified as to the nonnavigability of the relevant segment at the time of North Carolina’s statehood in 1789. Dr. Harvey, a fluvial geomorphologist, described the river’s geological profile and the challenges this profile would have presented for navigation. He explained that the dominant characteristic of the relevant segment is the Carolina Slate Belt underlying it, which is composed of rocks that are very hard and very difficult to erode. The hard and unerodable nature of the riverbed, he explained, allowed for the river to be steeper than rivers with softer underlying materials. And this steepness, in turn, contributed to a greater flow speed of the river, which reached up to 7 feet per second or nearly 5 miles per hour. Dr. Harvey noted that this speed is considered high velocity for a river and creates white water.
Dr. Harvey also explained that the relevant segment was characterized by shoals (or shallow areas) extending over much of its area. Some of the shoals extended for as long as two miles. And the steep grade of these shoals again increased the velocity of the river, adversely affecting navigation. Moreover, the shoals contained waterfalls, ledges, and boulders, and avoiding these obstacles would have been difficult, especially because of the high speed of the river, which decreased the amount of time that navigators had to react.
In addition to shoals, the relevant segment contained at least five named waterfalls, representing vertical drops of five to seven feet. Dr. Harvey explained that traveling down these waterfalls would have been extremely difficult and traveling upstream would have been essentially impossible. And, in another part of the relevant segment, called the Narrows, Dr. Harvey explained that the river contracted from 1,800 feet in width to 60 feet at its narrowest, where the flow was influenced by sharp rocks and characterized as turbulent, which would have made traversal extremely difficult and perhaps impossible even with portages.
In addition to these structural characteristics, navigation at statehood would also have been made difficult by the unpredictability of weather conditions. Dr. Harvey explained that, because of the nature of precipitation in the relevant area of the Yadkin, flooding could occur at any time without warning, making navigation even more difficult.
Alcoa also presented Dr. Mark Newell as an expert in marine archaeology, who testified that the vessels that would have been used in commerce in 1789 were not suitable for commercial navigation in the relevant segment. He first discussed the dugout canoes used by Native American communities of the region, which were made by digging out the interior of a tree. He pointed out that these canoes were very unstable and would have capsized if carrying a heavy load. He also discussed the pole boat, which, he explained, was also unsuited to commercial navigation of the relevant segment in 1789. Pole boats ranged from 30 to 70 feet long while only six to seven feet wide and could carry up to 20,000 pounds of cargo. But they were unable to make the turns needed to navigate around large obstacles. Moreover, presenting the length of such a vessel to the current would cause it to capsize. Dr. Newell also explained that, because these boats could not navigate upriver, they were ill-suited for commerce.
*153 Finally, Alcoa presented Professor Dan Morrill as an expert on North Carolina history during the relevant period. Much of his testimony derived from records kept by the Moravians, a religious group that lived in a tightly knit community in the area of the relevant segment. The Moravi-ans kept remarkably complete records as an aspect of their faith, including those of their commercial activity. From those records, Dr. Morrill was able to gain insight into the facts of contemporary navigation of the Yadkin River. He stated that in the hundreds of pages that he reviewed, he saw absolutely no reference to the relevant segment’s use in commerce. Rather, he found that the Moravians transported their goods to market using wagons, which, according to the records, would often be taken to the heads of other rivers that the Moravians did use for navigation. The Moravians also noted explicitly that there were no navigable waters in the area of the relevant segment and, more particularly, that the Yadkin was “useless for commerce” because of its “terrible falls and numerous rocks.”
North Carolina presented one expert, Dr. Larry Tise, who concluded that the historical evidence showed that the river had in fact been navigated for commerce at statehood. To reach that conclusion, he relied on records referencing attempts shortly after statehood to improve the navigability of the relevant segment, but he acknowledged that, without improvement, the relevant segment was “not passable with safety.” He also relied on individual accounts of travelers moving along the Yadkin, but those accounts explicitly noted that their journeys required the use of portages. For instance, Richmond Pearson, a resident of the area who sought to improve the navigability of the Yadkin, reported that he “portaged around the Narrows.” And a rumor from that time referred to the use of the Yad-kin to transport tobacco, involving “only seven miles land carriage round the Narrows of the Yadkin.” Dr. Tise acknowledged that the river at North Carolina’s statehood was “shoally” and that portage was required. Indeed, he described the Yadkin River as a “barrier” to navigation.
Taken in its entirety, the expert testimony about navigability in 1789 amply supports the district court’s finding that the relevant segment was not navigable at statehood under PPL Montana.
Again, as to this finding of fact, the dissenting opinion simply announces its view of the evidence, without addressing the evidence of record that supports the court’s finding. In particular, the dissenting opinion fails to acknowledge the testimony of any of the three expert witnesses that noted that numerous and various portions of the 45-mile segment were not navigable, where any non-navigable portion would prevent the segment from satisfying the PPL Montana test. Were it to acknowledge all of the evidence before the district court, the dissenting opinion could hardly conclude that the district court clearly erred in its relevant factual findings.
IV
Because the district court did not clearly err in finding that the relevant segment was not navigable at statehood, North Carolina cannot claim title to the relevant segment’s riverbed as an aspect of its sovereignty. In determining the actual titleholder, N.C. Gen. Stat. § 146-79 assigns the burden of proving title to the contested segment to Alcoa. Alcoa undertook to meet its burden in two ways — by relying on North Carolina’s Real Property Marketable Title Act, id. § 47B-2, to claim title to 99% of the contested property and by *154 claiming adverse possession as to the remaining 1%.
North Carolina’s Real Property Marketable Title Act (“MTA”) provides that any “person ... who, alone or together with his predecessors in title, shall have been vested with any estate in real property of record for 30 years or more, shall have a marketable record title.” N.C. Gen. Stat. § 47B-2(a). The district court found and North Carolina concedes that Alcoa demonstrated satisfaction of its burden of proof under the statutory requirements of the MTA. Nonetheless, North Carolina argues that three exceptions vitiate the proof adduced by Alcoa and vest title in the State, even though none of those exceptions are included in the MTA’s long list of exceptions.
First, it argues that the MTA cannot be used with respect to land to which North Carolina obtained title when acquiring sovereignty. While the legal validity of this argument is dubious — because North Carolina could have conveyed any such land and thereafter become subject to the MTA, as “the force” of navigability for title would be “spent” and the State would be free to convey title, see Corvallis Sand & Gravel Co., 429 U.S. at 371, 97 S.Ct. 582— it can have no force here. As the district court correctly concluded, North Carolina did not obtain title to the riverbeds of the relevant segment by virtue of sovereignty because the relevant segment was not navigable at statehood. Accordingly, this argument fails.
Second, North Carolina argues that the MTA does not apply to land subject to public trust rights. But North Carolina fails to identify any basis for such an exception. While the text of the MTA does contain a fulsome list of exceptions, none makes mention of public trust rights. See N.C. Gen. Stat. § 47B-3. This is telling, especially since the Act provides that it is subject “only to such limitations” as listed in the statute and should be “liberally construed” to ease property owners’ burden in showing good title. Id. § 47B-9. Moreover, North Carolina points to no previous case recognizing or applying such an exception. Finding no support for this argument, we conclude that it too fails.
Finally, North Carolina argues that the MTA cannot be used against North Carolina because it is a sovereign. Again, this exception finds no support in the text of the MTA. Nor would such an exception be consistent with the purposes of the Act. If the MTA did not apply against North Carolina, the State could simply make a claim to any real property in the State and rely on § 146-79 to place the burden of showing ownership on the landowner. For most, this would be impossible, especially when records have been destroyed, such as by the fire in a Montgomery County courthouse that consumed some early deeds after statehood. The real property scheme that North Carolina proposes would thus run directly counter to the purposes of the MTA and to all norms of real property law. It is therefore not surprising that the North Carolina Supreme Court, in applying the MTA in a dispute over a State Commission’s ownership of real property, implicitly assumed that the MTA applies to the State. See Taylor v. Johnston, 289 N.C. 690, 224 S.E.2d 567, 579 (1976).
In sum, we affirm the district court’s conclusion that Alcoa proved its title to 99% of the relevant segment’s riverbed under the MTA.
The remaining 1% consists of land for which Alcoa, when it began acquiring title to the riverbed, could find no owner. The district court found that Alcoa met its burden of proving title to this remaining 1% under adverse possession.
*155 North Carolina’s law of adverse possession requires a claimant to show “actual, open, hostile, exclusive, and continuous possession of the land claimed for the prescriptive period [of 30 years] ... under known and visible lines and boundaries.” Merrick v. Peterson, 143 N.C.App. 656, 548 S.E.2d 171, 176 (2001); see also N.C. Gen. Stat. § 1-35(1) (“The State will not sue any person for ... any real property ... by reason of the right or title of the State to the same ... [w]hen the person in possession thereof ... has been in the adverse possession thereof for thirty years ... ”). Here, there can be little dispute that Alcoa has satisfied these requirements. For more than 50 years, Alcoa has openly acted as the sole owner of the riverbed in every respect, controlling access to it and constructing and maintaining facilities on it.
Nonetheless, North Carolina argues that Alcoa cannot rely on adverse possession here because, under N.C. Gen. Stat. Ann. § 1-45.1, “[t]itle to real property held by the State and subject to public trust rights may not be acquired by adverse possession.” As the district court recognized, however, this statute is not applicable here because North Carolina cannot show that it held title to the land in question during the time that Alcoa openly asserted ownership to it. This is not a case in which the State owns land subject to public trust rights that a private entity is attempting to obtain by adverse possession. Instead, North Carolina seeks to disrupt a facially valid adverse possession without any basis for asserting that it was in fact the landowner during the relevant period. Indeed, there is nothing in the record to preclude the inference that the land Alcoa obtained by means of adverse possession was privately owned when Alcoa began to occupy it, and North Carolina would, in such a circumstance, be inserting itself into a property dispute between private parties with the hope of obtaining property to which it has no legitimate claim. Such an intervention, unsupported by North Carolina law, would undermine the valuable role adverse possession plays in settling the ownership of property that has no clear chain of title.
[[Image here]]
At bottom, we conclude that the district court did not err in concluding that “Alcoa has title to the bed of the Relevant Segment.” The judgment of the district court is accordingly

AFFIRMED.

. After oral argument, Alcoa filed a motion to substitute Cube Yadkin Generation LLC as the party in interest, asserting that it has conveyed the property involved in this case to Cube Yadkin Generation. North Carolina opposed the motion.
Federal Rule of Appellate Procedure 43(b) provides that "[i]f a party needs to be substituted for any reason other than death, the procedure prescribed in Rule 43(a) [procedures for substitution upon death of a party] applies.” In view of the fact that North Carolina has opposed the motion; that we have not heard from Cube Yadkin Generation; and that we have not had the benefit of briefing to address the context of the conveyance and what reason is sufficient to satisfy Rule 43(b), especially when Alcoa continues as a viable corporation, we deny the motion but include this footnote to acknowledge Alcoa’s sale of the property.

. While PPL applied the Equal Footing Doctrine “to States later admitted to the Union, because the States in the Union are coequal sovereigns under the Constitution,” PPL Montana, 132 S.Ct. at 1227, it is not clear that all remaining 37 States, as North Carolina suggests, are covered by the Equal Footing Doctrine. For instance, Maine and West Virginia *147 might be considered in the class of the original 13 States, as they were originally part of Massachusetts and Virginia, both of which were among the original 13 States. Any resolution of this question, however, is not material to North Carolina’s argument that the original 13 States are treated differently under PPL Montana than are the later admitted States.